[Crim. No. 1518. Second Appellate District, Division One.—February 25, 1928.]

THE PEOPLE, Respondent, v. JOSEPH J. MORLEY, Appellant.

Cantillon & Hamilton and Frank A. Sievers for Appellant.

U. S. Webb, Attorney-General, and Lionel B. Browne, Deputy Attorney-General, for Respondent.

THE COURT.—Defendant was convicted of each of the offenses of embezzlement and larceny as respectively charged in the second and fourth counts of the information, and appeals from the judgments and from the order denying his motion for a new trial.

About March, 1925, the defendant was employed by the complaining witness William A. Bartholomae, Jr., as bookkeeper or office manager for Bartholomae Oil Corporation, which was owned by Bartholomae and of which he was president. Some time in the summer of 1925 an arrangement was made between Bartholomae and the defendant for dealing in stocks and speculating on the stock markets

through the firm of A. A. Housman & Company, brokers do-ing business in Los Angeles, by which Bartholomae was to furnish the money necessary for that purpose and defendant was to have charge of the operations. Pursuant to this arrangement an account was opened with Housman & Company in the name of defendant, with funds furnished by Bartholomae. About the time this account was opened, a written agreement under date of August 26, 1925, was entered into between Bartholomae and defendant in regard to it, the terms of which will be referred to later. On October 16, 1925, this account was transferred to Bartholomae by written instructions from both parties to Housman & Company, but no change was made in the method of handling the account. Some time in 1925, Bartholomae made an oral arrangement with defendant for the latter to go out and purchase units in the Bartholomae Oil Syndicates for Bartholomae or the Bartholomae Oil Corporation, Bartholomae furnishing the money for this purpose. These syndicates were common-law trusts which had been promoted by Bartholomae and a large number of persons owned interests, or "units," in them. Defendant spent considerable time in this business, and incurred traveling expenses in connection with it.

In August and September, 1925, or 1926, the defendant withdrew from the Housman account several sums, aggregating $2,600, which he wagered on the result of a golf tournament and lost. There is some confusion in the evidence with regard to the year of this transaction. Bartholomae and defendant each mentioned both 1925 and 1926 as the year, but the books of Housman & Company showed that it was in 1926. Some time after this wager was lost, defendant gave Bartholomae a note dated November 17, 1926, for the sum of $2,500, to cover this loss. This note had been partly paid at the time of the trial. The withdrawal and use of this money by defendant is the basis of the charge of embezzlement made in the second count.

In August, 1926, defendant obtained from Housman & Company a $1,000 Liberty bond, which had been deposited with them as collateral to the above-mentioned account and belonged to Bartholomae. Defendant pledged this bond to a bank to secure a loan of $800, which he used for his own personal affairs. Later the bank sold this bond at defend-

ant's request and credited the proceeds of the sale to his account. This transaction is the subject of the larceny charge made in the fourth count.

Defendant admitted both of these transactions as above stated. His defense as to the embezzlement charge was that the golf tournament wager was within the scope of the arrangement between him and Bartholomae for handling the Housman account, and he had therefore the right to use the funds in this account for that purpose, or at least that he believed this to be true and therefore had no fraudulent intent. As to the larceny charge, his claim was that Bartholomae owed him a considerable sum of money for expenses incurred by defendant in connection with the purchase of units in the oil syndicates, and also for a share which defendant claimed of the profits made on the Housman account, and that defendant had, or believed he had, a right to take the Liberty bond in satisfaction of these claims against Bartholomae. His theory is that these circumstances show the absence of the felonious intent necessary to constitute the offense of larceny, and he relies on the case of *People* v. *Eastman,* 77 Cal. 171 [19 Pac. 266], in support of his contention. That case does declare such a rule in larceny cases. This defense cannot be applied to the embezzlement charge, for by the provisions of section 511 of the Penal Code, the appropriation of property to satisfy an offset against the owner is not a defense to such a charge.

With reference to the charge of embezzlement, the evidence clearly shows that the parties entered into a written agreement in relation to the Housman account, which provided in effect that Bartholomae had given certain sums of money to defendant for the purpose of trading in various stocks, principally with Housman & Company; that defendant should have "the right to use said moneys for said trading in stocks in any way whatsoever which meets with his best judgment"; that all trading was being done by defendant "for the sole benefit" of Bartholomae; and that the agreement should convey to Bartholomae the title "to all of the accounts, moneys, stocks and funds on hand, growing out of this arrangement." This clearly did not expressly authorize defendant to make the wager on the result of the golf tournament, his authority being strictly limited to trading in stocks. There was no other written agreement be-

tween the parties in this matter. Bartholomae testified that there was no other oral agreement, that he gave defendant no permission to withdraw cash or securities from the Housman account, and that he had a conversation with defendant regarding the $2,600, as follows: "He told me that he had something to tell me, and went on to say that he had withdrawn some $2600, as evidenced by the Housman statements, which were in his possession, and that he had bet the money on a golf championship, British-American golf championship, that was to be played abroad somewhere, and he asked me to give him another chance, that he would make good, and that if I would take his note he would pay me out of his salary at the rate of $100 per month." Defendant admitted on the stand that he "assumed the responsibility for that $2,500," and gave his note to Bartholomae for that amount, and that he had paid a part of it and orally agreed at a later date to pay the remainder. He also testified that when he and Bartholomae were going over the accounts they came to this $2,500 and Bartholomae objected, saying, "I don't see why you should make a speculation like that." Defendant's reply to this objection, as testified to by him, while justifying the wager as a good one, did not include any claim that it was within the scope of his authority. Defendant also testified that when they made the arrangement about the Housman account, Bartholomae agreed that they would divide anything they made. Bartholomae denied making any such agreement, and of course it is inconsistent with the written agreement, which would supersede any such oral statement. But it does not appear that defendant in his testimony sought to justify the taking of the $2,600 on the ground that he was a partner, or otherwise jointly interested in the funds in the Housman account, and for that reason entitled to take and use those funds. As to his justification for using the money he testified as follows: "Q. Did you have Mr. Bartholomae's permission to withdraw the $2,500 cash from that account? A. I didn't need his permission Q. You had no written authority, did you? A. That money was handed over to me to speculate as best I thought. . . . Q. Yes. Your instruction didn't say anything about the use of the money? A. The instructions that I followed were the verbal instructions when the account was opened—to make money any way I could." This testimony does not

go directly to defendant's belief, yet it attempts to state a justification of his acts as being within the scope of his authority.

 While defendant was on the stand and next after he had admitted taking $2,500 from the Housman account and using it for the golf wager, his counsel asked him this question: "I will ask you what your belief was at that time with reference to as to whether or not you were acting within the scope of your authority?" The court sustained a general objection by the prosecution to this question, and the ruling is assigned as error. The objection should have been overruled. A fraudulent intent is an essential element in the offense of embezzlement. (*People* v. *Treadwell,* 69 Cal. 226 [10 Pac. 502]; *People* v. *Mitchell,* 74 Cal. App. 164 [240 Pac. 36].) "A witness may be examined as to the intent with which he did a certain act, when that intent is a material thing in the action." (*Fleet* v. *Tichenor,* 156 Cal. 343, 348 [34 L. R. A. (N. S.) 323, 104 Pac. 458], quoted and followed in *People* v. *Moore,* 48 Cal. App. 245, 251 [191 Pac. 980]; to the same effect, *People* v. *Farrell,* 31 Cal. 576, and other cases.)

 This court is of the opinion that the action of the trial court in sustaining the objection was prejudicial error, because if the question had been answered and a positive statement made that defendant did believe that in the transaction in question he was acting within the scope of his authority, such testimony, in addition to the testimony concerning oral authorization or oral statements by Bartholomae to the defendant that defendant should use the money to speculate as he thought best and make money any way he could, might have easily turned the scale, and might have led the jury to acquit on the charge of embezzlement. The case does not seem to be one of such positive and clear proof of guilt that we can properly disregard the error committed by the trial court and its probable effect.

Defendant testified, in support of his defense to the larceny charge, that Bartholomae gave him a list of unit holders in the Bartholomae Oil Syndicates with directions to go out and purchase units from them; that Bartholomae delivered to him approximately $40,000 to $50,000 for that purpose; that defendant paid in the aggregate between $40,000 and $50,000 for the purchase of units; that his total

expenses in making these purchases were between $1,600 and $2,000; and that he used about $200 of his own money for these expenses and the remainder was paid out of the money received from Bartholomae. He offered in evidence the list above mentioned, and on objection by the prosecution it was excluded. He also sought to show by his own testimony how many and what units he had purchased, and how much he had paid for the various units; but objections to the questions on these points were sustained. He also attempted but was not permitted to show by another witness from whom he purchased units at San Jose how many visits defendant made him on this matter. He now assigns all these rulings as error; arguing that if he had been allowed to show the details of his claim against Bartholomae for expenses it would have appeared in a more favorable light to the jury. The court, after discussing with counsel in the absence of the jury its rulings on defendant's own testimony, stated that it would allow a reasonable investigation into this claim, and that for this purpose defendant might state the aggregates of purchases made and of his receipts and expenditures for the purchase of units, also whether he spent more or less than Bartholomae gave him, whether he incurred expenses, and whether there was money enough to cover purchases and expenses. ■ While the previous ruling as to the number of units purchased was inconsistent with this statement of the court, defendant did not avail himself of the permission thus given him to repeat the question, and is therefore in no position to complain of that ruling.

■ As to the other matters, we do not find any error in the ruling of the court. Bartholomae had already testified that several hundred units were purchased; and to have embarked on an inquiry as to each of them would have introduced a multitude of collateral issues. In view of the other evidence hereinafter referred to, we do not see how it could have helped the defendant, unless by confusing the jury with these collateral issues. Under the circumstances the court was well within its discretion in thus limiting the inquiry.

■ Defendant asked this question of Bartholomae on cross-examination: "Now, what was the total amount that you paid to Mr. Morley for the expenses he incurred in the purchase of these units, traveling expenses?" An ob-

jection on the ground that this was immaterial and "gone into yesterday" was sustained. Neither of these grounds of objection was well taken. The matter gone into on the previous day was the total amount of money delivered by Bartholomae to defendant for the purchase of units, and not the matter of expenses. It was proper for defendant in support of his claimed defense to show how much had been paid him for expenses, as well as the amount of expenses he had incurred, and in view of the scope of Bartholomae's direct examination defendant should have been allowed to cross-examine him on this subject. The ruling was therefore erroneous, but this occurred before the above-mentioned statement made by the court while defendant was on the stand, in which statement the court also referred to its previous ruling on this question. Defendant made no request after that statement to have Bartholomae recalled for further cross-examination. In view of the change in its ruling indicated by the court, defendant should have made such a request, and having failed to do so he cannot now complain of the original ruling.

Even if there were error in not allowing defendant to show all the details of his claim against Bartholomae for expenses, as a defense to the larceny charge, we cannot see that it was prejudicial or resulted in a miscarriage of justice. At the trial two statements signed by defendant were introduced in evidence as People's exhibits. Each of these was headed "Summary. Statement of unit purchases by J. J. Morley." The first showed a balance in defendant's hands after paying certain expenses listed, and included these words: "Complete list of every transaction to date includes J. J. Morley's expenses to date. April 30th, 1926." The second listed certain expenses and showed the account exactly balanced. In it were these words: "Complete list of every transaction to date 7/20/26 including all J. J. Morley's expenses." Defendant did not claim to have incurred any further expenses after the date of the second statement. He admitted making these statements, but said they related only to particular trips and were not complete. This explanation was in direct conflict with the wording of the statements, and the jury did not accept it. In this connection they may have considered the fact that although defendant's total claim for expenses, as testified to by him,

was only $200, the bond which he took was for $1,000. While he claimed to be entitled also to a share of the profits of the Housman account, he did not testify, and it was not otherwise shown, that there were any such profits. The facts tended strongly to discredit defendant's claim that he took the bond in satisfaction of his claim against Bartholomae. We think the result would have been the same if he had been allowed to testify as to the details of expenses claimed by him.

Defendant asked Bartholomae on cross-examination when he was on the stand for the prosecution, whether he had given defendant a list of unit holders from whom to make purchases. An objection to this was sustained. In another part of this cross-examination substantially the same question was asked of Bartholomae, and he answered it in the negative without objection. Hence there was no error in the ruling complained of.

Defendant also asked Bartholomae on cross-examination what was the price fixed for the purchase of units— Bartholomae having previously testified that there was such a price. The objection to this question was properly sustained, as the price of the units was not relevant to any issue in the case.

Defendant also complains of certain rulings of the court sustaining objections to questions on his redirect examination. We have examined the rulings complained of and find no error in them. The questions do not purport to call for any explanation of defendant's testimony given on cross-examination, and there is nothing in the record to indicate that answers to them would have changed the effect of that testimony.

After the defendant's case was closed the prosecution called in rebuttal G. P. Deane, who testified that in January, 1927, he was auditing Bartholomae's books, and at that time had several conversations with defendant about the Liberty bond, in which on one day defendant said he would "dig it up" and would bring it down the next morning, and on the next day said he had forgotten to bring it. This testimony was admitted over the objection of the defendant, who had taken the stand in his own defense, that it was impeaching testimony and that no foundation had been laid for it by asking the defendant when he was on the

stand whether he had made the identical statements testified to by Deane. He now assigns the ruling admitting this evidence as error. Counsel for both sides seem to be agreed in the assumption that the testimony given by Deane was impeaching testimony for which a foundation must be laid by interrogating the defendant, as in case of any other witness, but this assumption is erroneous. Declarations and statements made by the defendant are original evidence against him, and the rules as to the impeachment of witnesses do not apply to the proof thereof, even if he takes the stand in his own defense. (*People* v. *Ferrara*, 31 Cal. App. 1, 5 [159 Pac. 621]; *People* v. *Sprado*, 72 Cal. App. 582, 593 [237 Pac. 1087].) It may be that in strictness this evidence was not rebuttal and should have been presented as a part of the prosecution's case in chief, but no objection was made on that ground. Moreover, since the order of proof is within the discretion of the trial court and no abuse of discretion appears here, the ruling would be sustained even against such an objection.

Another error complained of was the refusal of the court to instruct the jury that "the mere failure to comply with a pecuniary obligation, such as to pay a promissory note when due, does not amount to embezzlement." This is a correct statement of the law. Defendant gave Bartholomae his note for $2,500 to cover the sum taken by him and lost on the golf wager, and that note was still partly unpaid even at the date of the trial. From defendant's testimony the jury might perhaps have found that he was acting within the scope of his authority in taking and using the $2,600, and hence no embezzlement was committed by him in so doing; and, no doubt, it would have been proper to inform them that in case they so found, no embezzlement arose from the mere nonpayment of the note. While this instruction was not given, the court did quite fully instruct the jury as to the law relating to embezzlement, and the facts which must be proved to establish such a charge, and the jury must have understood from these instructions that the defendant could not be convicted of embezzlement merely by reason of his nonpayment of the note. The refusal of this instruction could not have worked him any harm.

The verdict of the jury rests for support largely on the testimony of the complaining witness Bartholomae.

Defendant produced at the trial several witnesses who testified, without objection, that Bartholomae's reputation for truth and veracity was bad. He requested the court to instruct the jury that a witness can be impeached in this manner. The court refused this instruction, but in the course of a general instruction relating to the credibility of witnesses informed the jury that "the, character of the witnesses, as shown by the evidence, should be taken into consideration for the purpose of determining their credibility." We think this was sufficient to call the jury's attention to the purpose for which the evidence of Bartholomae's reputation was admitted. In fact, we do not see how the jury could have failed to discern that purpose, even without any instruction. As reasonable men they must have assumed that the evidence was before them for some purpose, and the only possible purpose would be to impeach the credibility of the witness.

For the reasons hereinbefore stated, it is ordered that the judgment and order denying defendant's motion for a new trial as to the charge of embezzlement, as set forth in count two of the information, be, and they are, reversed; and that the judgment and order denying defendant's motion for a new trial, as to the charge of larceny, as set forth in count four of the information, be, and they are, affirmed.