## MILLARD C. GEYMAN v. STATE.

No. A-10793. March 10, 1948.
Rehearing Denied May 5, 1948.
(192 P. 2d 707.)

H. B. King, of Oklahoma City, and Falkenstine & Fisher, of Watonga, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Millard C. Geyman, was charged by information filed in the district court of Blaine county with the crime of embezzlement of public funds, was tried and convicted with the punishment left to the court.   Whereupon the court sentenced the defendant to serve three years' imprisonment in the State Penitentiary, and pay a fine of $4,000.

The information, in substance, alleged that between the dates of September 1, 1940, and January 21, 1943, the defendant, as city clerk of the city of Geary, was entrusted with and had in his possession and under his control by virtue of his trust as such official, the sum of $8,-275.02 in money which belonged to the city of Geary, and that the defendant embezzled and appropriated said money to his own use and benefit and to a use and purpose not in the lawful execution of his trust as such city clerk.

It is agreed by all parties concerned that the prosecution was brought under the provisions of Tit. 19, § 641, O. S. 1941.   Under proposition one of defendant's brief it is contended that in order to sustain a charge of embezzlement under Tit. 19, § 641, O. S. 1941, the state must prove by competent evidence a fraudulent conversion of the fund; and such conversion must be shown by proof that the defendant appropriated the money to his own private use or to some other use inconsistent with his trust, that the evidence wholly fails to establish beyond a reasonable doubt these essential elements of the offense charged and is therefore insufficient to sustain the conviction.

The evidence shows that the defendant as city clerk of Geary had charge of making collections for the city of Geary of light and water bills, occupation license taxes,

dog taxes, the sale of cemetery lots, and miscellaneous items; and that as these items were collected, a daily cash sheet was kept upon which the collections were entered by the party making the collections at the time the collection was made and in turn the amount shown on the collection sheet was deposited to the credit of the city treasurer. The state was unable to prove any shortage in the accounts of the defendant as city treasurer in so far as it pertained to any of the various collections he made other than the collection of the light and water bills. The proof showed that the light and water accounts were kept by the city clerk. The city clerk made up statements in triplicate from meter readings. These statements were bound in permanent book form. The first copy was torn out and mailed to the customer as a statement of his bill; the second copy was left permanently in the book; and the third copy was retained in the book until the consumer came in and paid his bill, at which time the third copy was stamped "Paid" with a rubber stamp and given the consumer as a receipt; and at the same time the copy remaining in the book was stamped "Paid" with the rubber stamp. The accounting system of the city of Geary did not include a permanent record of the individual light and water accounts, and the only record kept was the receipt books. As stated above, a daily collection sheet was kept upon which collections, from all sources, were entered at the time of making the collection. The deposit slips showing the funds deposited to the account of the city treasurer were made up from the daily collection sheets.

The proof further showed that the defendant took offfice as city clerk of Geary on May 1, 1933, and continuously served in that capacity until January 23, 1943, when he resigned to accept a job with an oil company in Okla-

homa City. After the resignation of the defendant and before his successor took office, an accountant was employed by the city to make an audit of the books and records kept by the defendant as city clerk. The auditor thus employed by the city was the individual who had prepared the annual budget for the city council, and one of the facts relied upon as part of the defense was that this auditor had written the city council in July of 1941, and again in July, 1942, advising them in substance that he had made a check of the records of the city and that they were in good shape and that he found nothing in the records of the city clerk and city treasurer that was subject to criticism. The auditor explained this letter in his testimony by stating that he did not attempt to check the money received by the city clerk from the time of its inception, but only made a routine check of the daily collection sheet with the corresponding deposit slips for the purpose of determining the funds on hand in order to enable him to prepare a budget for each fiscal year.

The auditor testified that he found a discrepancy between the total of the receipts stamped paid in the light and water account in the permanent book kept for that purpose, and the total amount of money entered on the daily collection sheets and deposited to the credit of the town treasurer. He testified that the amount shown on the daily collection sheets and the amount deposited daily to the credit of the town treasurer tallied exactly.

The evidence further showed that the defendant received the sum of $65 per month as a salary for his work, and that the city council in addition set aside the sum of $10 each month to pay for the employment of additional help to assist the defendant during the rush period of collections the first of each month. The proof showed

that three different women had been employed by the defendant at different periods during the time covered by the audit. That only one of these women was employed at a time and her work was generally limited to a period of four or five days work in each month, or not to exceed seven days at $1.50 per day. That the receipts were stamped by the person making the collection which would be the defendant or one of the women who assisted him.

The Rock Island Railway Company was one of the largest water users of the city. The evidence showed that they paid their bills each month and took a receipt on a form prepared by their auditor which showed the amount of water consumed by the company in detail, and that this receipt of the company was presented by their agent at the time their bill was paid, and that in addition to stamping the receipt in the permanent light and water account book kept by the city, that the clerk would also sign the receipt presented by the railroad company. In order to show how a part of the shortage had been covered by the defendant, the state's evidence disclosed that most of the light and water statements presented by the railroad company during the two year period were receipted in the handwriting of the defendant. These checks by the railroad company in payment of their month-ly bills varied from approximately $50 to $150 per month. None of these checks were listed as collections on the daily collection sheet, but all of them were deposited to the credit of the city treasurer and it was the contention of the state that the defendant, having received the check in person from the railroad company, omitted the entry of that collection on his daily collection sheet, but then later deposited it to the credit of the city and took currency which was part of the collections as shown upon the daily collection sheets and ap-

propriated it to his own use. In that way, the amount of the daily collections, as shown by the collection sheet, tallied exactly with the amount of funds deposited to the credit of the city treasurer. In the report of the auditor it was shown that there were four large light and water accounts each month, to wit: R. A. Young & Company, Conoco Service Station, CCC Camp, and the Chicago-Rock-Island & Pacific Railway Company, and that these large accounts during the period covered by the audit from September, 1940, to January 31, 1942, were paid by the consumer but were not entered on the daily reports on the cash collection book although they were deposited to the credit of the city treasurer.

On behalf of the defendant, he offered many witnesses to show his good reputation and offered abundant evidence that he was leading a frugal life, and that nowhere could it be shown that he had expended any sums of money which would have been considered extraordinary by a person in circumstances similar to defendant in an ordinary town. The defendant made such an excellent showing of his exemplary character and frugal manner of living that this court has very carefully examined each bit of evidence offered by the state to see whether there was any competent evidence upon which the jury could base their verdict of guilt. The auditor testified that when he commenced to check the records of the city clerk at the time of the resignation of defendant, he found that there were irregularities consisting of a difference in the total amount of the stamped light and water receipts from the amount shown on the daily cash book. That when he discovered these irregularities, he spoke to the defendant about it before reporting to the governing board of the city, and that when he advised the defendant what he had found, the defendant said " I was

afraid of that". The defendant testified in his own behalf and when asked to state whether he thought the audit was correct, stated that he thought that it was, and he was unable to point out in any particular where the audit was incorrect or wrong. In this connection he testified:

"Q. Who got this much money that is short here? A. I don't know who got that money. Q. You don't mean to tell the court and jury that any of these girls that worked for you got it? A. I don't know whether they got it. I don't know. Q. And if the money is gone, and the girls didn't get it, there is only one other person that could have got it? Isn't that true? A. No, that isn't true. Q. Well, who else could have got it? A. I don't know where the money went. Q. You know the girls didn't get it? A. No, I don't know that they didn't get it. Q. But do you say they did? A. I said I would not say that they got it."

The evidence further showed that the defendant employed an auditor to audit his books and records as city clerk after the audit made by the witness Lowry had disclosed considerable shortage. This auditor employed by the defendant testified as a witness for the state and said that his audit showed a shortage of $8,734.36, which was in excess of the shortage disclosed by the accountant employed by the city. The auditor employed by the city explained this discrepancy by saying that in every instance where there was the least bit of doubt, he gave the benefit of the doubt to the defendant and did not set up the item as part of the shortage, whereas the auditor employed by the defendant included in his statement of the shortage all funds traced to the office of the city clerk whether received by the defendant or one of the women who assisted him, but which were not accounted for by being deposited to the credit of the city.

The evidence further showed that when the audit was presented to the city council, they notified the defendant of the alleged shortage and asked if he could meet with them at a special meeting of the city council and go over the audit, to which the defendant agreed; but that on the date set for the special meeting of defendant with the city council, the defendant did not appear but did have a representative at the meeting in the person of his attorney who stated that the defendant had nothing to say.

The chief contention of the defendant is based upon the proposition that the state did not show by direct evidence that he personally appropriated one cent of the city's money, and that since other persons than himself received a part of the money paid into the clerk's office during the period of time in controversy, that there is just as much inference that they appropriated the money to their own use and benefit as there is that the defendant had appropriated it to his own use and benefit. The defendant relies chiefly upon the rule of law laid down by this court in the case of Severn v. State, 72 Okla. Cr. 141, 114 P. 2d 181, wherein this court stated:

"Under the terms of the above statute, Oklahoma Statutes 1931, Section 7761, 19 Okla. St. Ann. § 641, it must be shown that there was a private appropriation of the fund as charged in the information, and the mere failure to report and pay over the fund, without any private appropriation or conversion, would not be sufficient."

Reliance is also had upon the case of Hays v. State, 22 Okla. Cr. 99, 210 P. 728, and Blake v. State, 12 Okla. Cr. 549, 160 P. 30, L. R. A. 1917B, 1261.

The facts in each of the above cases relied upon by the defendant are quite different from the facts proved by the state in the instant case. We think the facts in the instant case more nearly conform to the facts in the

case of Smith v. State, 61 Okla. Cr. 427, 69 P. 2d 394. In that case, this court reiterated the rule of law that under a prosecution for embezzlement under § 641, Tit. 19, O. S. 1941, there must be an appropriation to the defendant's own use. However, the conviction was upheld on a state of facts similar to those here proven.

In the syllabus of that case it is stated:

"Under section 7761, O. S. 1931 (19 Okla. St. Ann. § 641), in a charge of embezzlement against a public official, there must be an appropriation to his own use. Evidence examined and held to show an appropriation of public funds by the defendant."

"The inference that one has embezzled property by fraudulently converting it to his own use may be drawn from the fact that he has not paid the money in due course to the owner, or from the fact that he has not accounted for the money which he has received. This is especially true of public officials in the handling of public funds."

"A public officer charged with the safekeeping and disbursement of public money may, by a series of personal appropriations of small sums of such public fund, render himself liable to prosecution for the embezzlement of a particular gross amount, as constituting but one offense, under the provisions of our statutes defining embezzlement of funds willfully appropriated to uses not in keeping with his official trust."

In the body of the opinion it is stated:

"In order to appropriate the public funds to one's private use it is not necessary for the state to show by direct evidence the actual securing of the funds and the spending of the same. Often this would be impossible. When the funds were shown to have come into the actual possession of the defendant and they were not deposited in the office of the county treasurer, or turned over to the county in the manner provided by law, the jury has

a right to infer that they have been misappropriated under the statute above indicated. The cases draw a close distinction as to the duty devolving upon public officials and those devolving upon individuals and especially when they are acting under a special statute, adopted for the purpose of protecting public funds which have come into the possession of public officers.

"In the case of O'Brien v. United States, 27 App. D. C. 263, the court says:

" '* * * the inference that a prisoner has embezzled property by fraudulently converting it to his own use may be drawn from the fact that he has not paid the money in due course to the owner, or from the fact that he has not accounted for the money which he has received. Stephens' Digest Crim. Law, art. 312.'

"And in the case of Reynolds v. State, 65 N. J. L. 424, 47 A. 644, 646, the court says:

" 'A demand is only one class of evidence for proving fraudulent conversion. Other classes are: (1) Where, by statute, a public officer is required to pay over funds at a definite time, and fails to do so, and there is proof that he has not done so, and that he has applied the same to his own use, that is evidence from which a jury may find a fraudulent conversion, even without a demand; or (2) where, by the rules and regulations or agreement under which the defendant is employed, and to which he is required to conform, a time is definitely fixed for him to account for moneys received, and it appears that he has lawfully received moneys of his employer, but has not paid over the same in accordance with such rules, regulations, or agreement, but has converted the same to his own use, this is also evidence from which the jury may find that there was a fraudulent conversion of such funds without formal demand.' "

For other cases upholding this view, see Casselman v. State, 58 Okla. Cr. 371, 54 P. 2d 678; Griswold v. State, 23 Okla. Cr. 136, 212 P. 1018; Abernathy v. State, 69

Okla. Cr. 142, 101 P. 2d. 634; Liddell v. State, 61 Okla. Cr. 306, 68 P. 2d 432; Hutchman v. State, 61 Okla. Cr. 117, 66 P. 2d 99; Sawyer v. State, 73 Okla. Cr. 186, 119 P. 2d 256.

In the instant case the state showed that a large number of light and water payments were receipted personally by the defendant, but that these collections were not reported on the daily cash book. This was an evident falsification of the official records for the purpose of concealing the shortage. When the defendant was called upon to attend a meeting of the council, he failed to appear and explain the shortage.

In American Jurisprudence, 18, Embezzlement, § 40, P. 596, it is stated:

"In order to authorize the conviction of a public officer for embezzlement, it must usually be shown : (1) That the accused is a public officer or occupies a fiduciary relation; (2) that the money or property which he is charged with appropriating to his own use came into his possession by virtue of his office or employment; and (3) that he embezzled or fraudulently converted it to his own use. A public officer cannot be legally convicted of embezzlement upon evidence of a mere refusal or neglect to pay over funds in his hands. There must be some evidence in addition thereto from which it may be clearly inferable that the neglect to turn over the funds was either in contemplation of a misappropriation or the consequence of the misappropriation. When, however, there is in addition proof that the officer falsified accounts, that he was guilty of evasions in explaining defaults, that he fled, or that he committed other acts indicating guilt, a case is sufficiently made to put the officer upon explanation. If he proffers no satisfactory explanation, a conviction for embezzlement may be upheld."

360

In the case of Smith v. State, supra, one of the defenses relied upon was that some one else besides the defendant had access to the funds in controversy. It is similar to the defense here interposed. In the Smith case, this court said:

"The contention of defendant that some one else could have misappropriated the funds is merely a conjecture. The evidence showed that he was the one who had charge of them, and he was the one who failed to account for them, according to the verdict of the jury."

A similar contention was made in the case of Abernathy v. State, supra, [69 Okla. Cr. 142, 101 P. 2d 635], wherein this court stated:

"The undisputed evidence leaves no doubt that defendant had complete charge of the collection of delinquent personal tax warrants sent to the sheriff's office by the County Treasurer, and also the collection of delinquent sales taxes sent to the office by the Oklahoma Tax Commission. The evidence also reveals that other deputies at times assisted him and especially when he was not in the office at the time parties came to pay their delinquent taxes, but he was the one who had charge of the books and the money collected, and made the reports and deposits, as his duty required.

"The method adopted for the collection of these delinquent tax warrants was simple, and if carried out in a lawful manner there was no chance or reason for a mistake or mishandling of the funds to be made. If any error was committed the defendant, under the system adopted, should have known it at once, and could have corrected it forthwith and made the error known to his superior officer, the Sheriff of Oklahoma County."

The evidence against the defendant is wholly circumstantial. In other words, there was no direct proof by the state that the defendant took any particular money belonging to the city and used it for his own benefit. We

think the circumstances which were shown were sufficient, if credited by the jury, to show a personal appropriation of the funds by the accused. There could be no other reasonable or logical deduction based upon the proven method of operation by the defendant. The audit showed that there was a systematic misappropriation of funds each month during the period of the audit. It is true that the women employed could have embezzled these funds. They, however, were employed at different times and two of them for only a short period of time. It is reasonable to conclude that the systematic monthly misappropriation of funds was conducted by the defendant, who was the head of the office, had supervisory control of the records, and was the only individual who was employed during all of the period of time covered by the audit.

It is contended that the court erred in refusing certain instructions requested by the defendant, and that the instructions which were given were erroneous as to the law of the case. The requested instructions in substance would have told the jury that the state must prove by evidence beyond a reasonable doubt that the money in question came into the defendant's hands or under his control while acting in his capacity as city clerk, and that defendant converted it to his own use and benefit or appropriated the money for some other purpose not in keeping with his trust, and that proof of a shortage alone or mere failure to pay over the money would not warrant a conviction.

These instructions represent substantially correct statements of the law and set out the essential elements of the offense defined by the statute under which this prosecution was instituted, and the construction placed upon the statute by this court as shown by the cases here-

inabove cited. However, the record shows that all of the three requested instructions were substantially covered by the instructions which were given. The court gave a full and comprehensive set of instructions. Among the instructions so given were the following:

Instruction No. 6.

"You are instructed that the material allegations in the information contained are as follows:

"1. That the defendant, Millard C. Geyman, was the duly elected, qualified and acting city clerk of the city of Geary during the time alleged in the information;

"2. That as such city clerk he was charged and entrusted with, and had in his possession and under his control, by virtue of his trust as such city clerk, the sum of $8,275.02 or some part thereof, which came into his possession in the exercise of his official duties as such city clerk of the city of Geary, and that said money was then and there the property of the city of Geary;

"3. That the defendant, while so entrusted with said sum of money or some part thereof, did then and there, between the first day of September, 1940, and the 31st day of January, 1943, wrongfully, fraudulently and feloniously embezzle, convert and appropriate the said sum of $8,275.02, or some part thereof, to his own use and benefit and to a use not in the due and lawful execution of his trust as city clerk of the city of Geary."

Instruction No. 8.

"You are instructed that before you would be justified in returning a verdict of guilty in this case, you must find from the evidence beyond a reasonable doubt that between September 1, 1940, and January 31, 1943, the sum of $8,275.02 or some part or portion thereof was the property of the city of Geary and that the said sum of $8,275.02 or some part thereof so belonging to the city of Geary came into the hands of the defendant as city clerk of said city of Geary, and that between September

1, 1940, and January 31, 1943, the defendant converted said sum or some part thereof to his own use and benefit or to the use and benefit of some other person, body corporate, or other association; and unless you find the same from the evidence beyond a reasonable doubt, it will be your duty to acquit the defendant of the crime charged in the information."

### Instruction No. 10.

"You are instructed that proof of a shortage in the accounts of the defendant between September 1, 1940, and January 31, 1943, would not, alone and of itself, be sufficient to sustain a conviction of the defendant of the crime charged in the information.

"However, you are further instructed that if you find from the evidence beyond a reasonable doubt that between September 1, 1940, and January 31, 1943, the defendant, while city clerk of the city of Geary, became short in his accounts with the city of Geary in the sum of $8,275.02, or some part thereof, and that he failed to account for the same to the officers of the city of Geary, then and under such circumstances you may take the same into consideration, together with all other circumstances submitted in the case in order to determine whether or not the defendant during said period of time did or did not appropriate to his own use and benefit, or to use and benefit of some other person, not in keeping with his trust, the sum of $8,275.02, or some part thereof, of the funds belonging to the city of Geary."

In Brock v. State, 39 Okla. Cr. 162, 263 P. 1115, 1116, this court stated:

"It is not error to refuse proper requested instructions, where they are substantially covered by the general charge of the court."

This court is moved with compassion toward the condition of the defendant. He is a cripple and the record discloses that he and his wife worked hard at raising

chickens and sold chickens and eggs to try to secure additional funds to meet the high cost of living. His neighbors testified to his exemplary manner of living. The trial court was evidently moved with compassion also as he gave the defendant the minimum term of three years' imprisonment in the State Penitentiary, and instead of fining him a sum in excess of $16,000 as would have been sustained by the statute, he assessed a fine of $4,000. While we are firmly convinced of the guilt of the defendant, there are many facts which might appeal to the Pardon and Parole Board if an application is made to them for clemency. This court, however, cannot extend clemency, but is confined to the proposition of determining whether the defendant had a fair and impartial trial. Of that question there is no doubt in our mind. The judgment and sentence of the district court of Blaine county is affirmed.

BAREFOOT, P. J., and BRETT, J., concur.