## CAWLEY v. STATE.

No. A-11412.   Sept. 3, 1952.

Rehearing Denied Sept. 24, 1952.

(248 P. 2d 273.)

54

Hal Welch, Hugo, and F. L. Welch, Antlers, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. This is an appeal by Frank Cawley plaintiff in error, defendant below, who was charged in the district court of Choctaw county, Oklahoma, with the crime of larceny of 18 head of cattle, in violation of Title 21, § 1716, O.S.A. 1941, on August 18, 1949, in Choctaw county, Oklahoma, said cattle allegedly being the property of W. R. Stone, H. H. Coker and W. J. Massey and all of said cattle at the time of said theft being under the control of W. R. Stone on the premises owned by W. J. Massey. Defendant was tried by a jury, convicted and his penalty fixed by said jury at a term of 6 years in the penitentiary. Judgment and sentence was entered accordingly, from which this appeal has been perfected.

In view of the fact that the defendant challenges the sufficiency of the evidence to sustain the conviction, we shall consider this objection to the conviction first. In considering the evidence contained in the 518 page record, it is pertinent to note that much of the evidence is immaterial. The sole and only question we are interested in from an evidentiary standpoint is, Did the defendant take and steal the cattle herein in question and thereby render himself subject to the terms and conditions of the statute, Title 21, § 1716, O.S. 1951, reading in part, as follows:

"Any person in this State who shall steal any * * * cow, or hog, shall be guilty of a felony and upon conviction shall be punished by confinement in the State Penitentiary for a term of not less than three years, nor more than ten years."

We shall make no attempt in this opinion to cover the entire scope of the evidence. It will be sufficient to state the gist of the state's case and the gist of the

state's case and the gist of the defendant's evidence. It appears from the record, Mr. Massey, a resident of Texas, owned several tracts of land near Fort Towson, Oklahoma, and particularly a pasture containing 320 acres where he and Mr. H. H. Coker owned some cattle in common, which were cared for by Mr. W. R. Stone, Mr. Massey's tenant who likewise had some cattle himself. It appears from the record that in the 320-acre pasture there were 38 head of cattle, and that on Sunday, August 21, it was discovered that 21 head of them had disappeared or had been stolen. One of the witnesses for the state was Clarence Bo Weekly, a Negro man. He testified that he lived in Choctaw county most all of his life and at the time in question herein he was living at "Irishman" Cawley's place, he being the defendant Frank Cawley's brother. Weekly testified he had fed cattle for "Irishman" Cawley, and had picked cotton, and performed other services in the community as a hired man. He said that on Thursday, August 18, 1949, he and Jess Earnest took a truck load of cattle consisting of 18 head to Paris, Texas, for Frank Cawley, unloading them at the Paris Sales Barn. The records of sales as disclosed by the testimony of B. H. Ford of the Paris Sales Barn, confirmed such a transaction. It appears that 18 head of cattle were sold by Frank Cawley for a total price of $1,201.85. The check in payment therefor was introduced in evidence. Weekly, for the state and Earnest testifying for the defendant, both related that Earnest drove the truck load of cattle to Paris, accompanied by Clarence Bo Weekly. It further appears from the record that Frank Cawley drove down in a pick-up truck belonging to Jess Earnest, arriving shortly after Weekly and Earnest got to Paris, Texas. Weekly related that the cattle were taken from Mr. Massey's pasture on Wednesday. He said the arrangements were made with him by Frank Cawley, that assisted by Jess Earnest, the three of them would get a few cattle from Mr. Massey's pasture. Jess Earnest for the defendant reluctantly corroborated him in the fact that they were in this pasture, but both of them denied they knew they were stealing them. It appears, however, from Weekly's testimony in chief that Cawley told him they "would get a few of Mr. Massey's cows". Weekly testified they got the cattle on Wednesday afternoon from Mr. Massey's pasture, and drove them to Mr. Cawley's loading pasture about a half mile away. It is agreed that on Thursday morning they loaded the truck with cattle to take them to Paris, Texas. One old roan cow was bawling, Weekly related, in fact making so much noise they decided to unload her. She was left in the pen and the remainder of the cattle on the truck were taken to the Paris Sales Barn at Paris, Texas. It is admitted by Frank Cawley that he sold the 18 head of cattle on Thursday afternoon in Paris, Texas, at the Paris Sales Barn, and received the check therefor. It had been so proven before his admission. The sale being consummated, Weekly related that he and Jess Earnest returned to Fort Towson in the truck in which the cattle had been hauled to Paris. When they got back Weekly testified Cawley parked the pick-up, and the three of them got in the cattle truck to go and return it to Davis and get Cawley's pick-up, and also to go to Cawley's little loading lot, which they did, where they loaded the bawling roan cow and drove north of Fort Towson about ten miles and a little north of the high bridge on what is called the Red Road, backed the truck up to the bar ditch and let the old roan cow out. This testimony is denied by Earnest. He says it didn't happen. The defendant likewise denied this happened. Circumstances proven by other witnesses established somebody did it. It appears near where the roan cow was unloaded, that the road turns west and that the roan cow proceeded west 2½ or 3 miles until she was picked up and penned by Pete Buchanan. Weekly testified after they dumped the roan cow they decided to return the cattle truck to Cecil Davis from whom it had been borrowed. At the same time it was their plan to re-claim the pick-up truck of Cawley's which he had loaned to Davis, while he used Davis' cattle truck to haul the cattle in to Paris, Texas. Weekly said the pick-up truck was stuck in a mudhole, about a half mile from the Davis home, and they could not

get through to deliver the cattle truck. Thereafter he went to Davis' house and got the keys to the pick-up truck. Both he and Mr. Davis related in their testimony that this was some time after midnight. They used a lariat rope which Mr. Cawley had in his truck as a tow to pull the pick-up out of the mud. The lariat broke and Weekly then returned to Davis' house and got a log chain. Davis corroborated Weekly's testimony in this regard, as does Jess Earnest and Frank Cawley in their testimony. With the log chain they pulled the pick-up out of the mud, left the keys in the cattle truck, and went home in the pick-up. The next day Weekly related, that Mr. Cawley gave him two $20 bills and a $5 bill and told him to keep his mouth shut.

On the following Sunday word was received by Mr. Stone and Mr. Coker that the roan cow was penned up in Buchanan's pen and they went there and identified her. Mr. Coker said he had raised her. Returning to the Massey pasture they then discovered that 20 head of cattle had been stolen or at least had been taken from the pasture. Thereupon they began a search for the missing cattle. On Thursday night when the truck was returning from Paris, Texas, a big rain had fallen. A check was made by the sheriff and several other witnesses of the road leading to where the old roan cow dropped off from the truck into the bar ditch. Dual wheel truck tire tracks led to the point where Weekly said they dumped the roan cow out. Several witnesses testified the truck tracks indicated the truck backed up to the bar ditch, a lone cow's tracks were visible and then the truck tire tracks turned back south. Witnesses also testified it was a dual wheel truck. There were a few who testified it was a single wheel truck. These circumstances strongly corroborated Weekly's testimony in relation to the roan cow. His testimony in relation to gathering the cows was likewise corroborated by Jess Earnest, who testified for the defendant that they did gather them. To the contrary, he testified the cattle were gathered on Tuesday, instead of Wednesday. He related that in going to the salting place on the river they rode through pastures, the first fence they came to was "Irishman" Cawley's, and then may be through the corner of Mr. Coker's place. Frank was not with them when they started gathering, he related. He gathered a bunch he though he wanted. He started bringing them home to Cawley's, he said. They made a trip or two to get them. He brought them to a little fenced enclosure. After they were gathered he said Frank Cawley told them what to cut out. What was left would be hauled away and sold, he stated. He related he had no reason to believe the cattle were not Frank Cawley's, that nothing had been said to him about stealing any cattle. He testified the cattle were delivered at Paris and unloaded before Cawley got there. On cross-examination he stated he went across Mr. Massey's place but he didn't much think they were on the Stone place in gathering the cattle. He then admitted they went across the corner of Stone's place. He knew Mr. Massey and Coker and Stone had some cattle there in partnership. The weakness of this testimony is obvious. The mere fact the witnesses admitted they passed over lands of Coker, Massey and Stone, and that some of their cows were sold in the Cawley Paris transaction, is a circumstances so conclusive as to leave little doubt that they were gathered in passing. The fact the Massey, Stone and Coker cattle were not cut out, likewise, is a strong indictment of the defendant and his intentions.

Coker's identification of the roan cow was positive and unequivocal. Ordinarily, the actual status of the legal title to stolen property is no concern of the thief. Jackson v. State, 86 Okla. Cr. 420, 193 P. 2d 895. But, herein, the defendant contends that the roan cow was the only cow identified, that he knew nothing about how the roan cow came to get out of the pasture, and that the cattle he sold belonged to him. These contentions required us to make a close check of the evidence with reference to the identification of the cattle sold through the Paris barn by the defendant Cawley as to whether or not they had been sufficiently identi-

fied as to disprove Frank Cawley's claim of ownership. In making this check we traced the cattle as described in the receiving sheet of the Paris Sales Barn, on which was carried the purchaser's name as well as the Sales Barn number of the cow. The number given the cow was printed on a tag and fastened in her ear. From the evidence offered in the state's case in chief by Mr. B. H. Ford, the bookkeeper from the Paris Sales Barn, we were able to ascertain the address of the purchaser of the cattle. The record shows, that Mr. Stone and Mr. Coker went to Texas, armed with this information, traced and identified as their cattle, two cows south of Paris, Texas, bought by Mr. Davidson, and sold by Frank Cawley through the Paris Sales Barn and cows No. 1093 and 1098, Mr. Stone testified, he recognized them. He testified, they belonged to Mr. Massey and Mr. Coker. At East Sulphur Springs, Texas, two cows were identified by W. R. Stone, as his and one as Mr. Coker's. He testified he raised the one he identifed as his own. These two were in the possession of Leveret Ross, whom it appears purchased them from the Frank Cawley lot of cattle. The cows were tagged and sold as cows No. 1095 and 1101. Stone testified he recovered both of the cattle No. 1095 and 1101 with the aid of the Sheriff from Sulphur Springs, Texas. What was described as the Wright City cow he said belonged to Massey and Coker, but this identification was too weak to fall within the character of positiveness required by law. He identified cow No. 1099 purchased from the Frank Cawley lot as a Massey and Coker cow, but the identification does not exactly check with the receiving identification. Therein cow No. 1099 appears as a red white face cow. He identified the cow as a brown cow with a "C" on the left jaw. This apparently was a difference in designation as to color only, which the checker may have regarded as red while Mr. Stone would designate it as brown. However, Mr. Stone said she had a "C" on her left jaw which he used as a means of further identification. Mr. Stone testified Cow No. 1099 belonged to Massey and Coker, which was sufficient for consideration of the jury. (Four cows, No. 1089, 1096, 1097, 1105, were sold to Swift & Co. of Dallas, Texas. It does not appear any attempt was made to trace these cattle.) Mr. Stone testified that four of the cows were returned to the pasture the day before trial. . Hence, it appears that Mr. Stone traced and identified six of the cows stolen on August 18, 1949, as being his and 5 as being Massey & Coker's cows.

Mr. Coker testified for the state that, Mr. Stone lived on the Massey pasture land, and looked after his own cattle and some that he and Mr. Massey owned together. He identified the roan cow stating that he raised her. This identification is admitted by the defendant.

Mr. Coker likewise identified the Roy Lynch cows purchased from the Frank Cawley sale at Paris on August 18, 1949. He described one of them as a spotted brindle cow with a little "C" on her left jaw. This description does not tally with the receiving sheet description. Both of these cows purchased by Roy Lynch are described as Red White face cows in the Paris Sales Barn receiving sheet as Cow 1090 and 1104. One of the cows with the little "C" on her left jaw he said he branded himself. The other cow he said was a Red White face cow and belonged to Mr. Stone. There was no discrepancy in this description to that entered on the Paris Sales Barn receiving sheet. He then testified to his identification of the Leveret Ross cows, both of which are described on the receiving sheet of the Paris Sales Barn as Red White face cows and numbered 1101 and 1095. One he described as a Red White face (motley) cow, the description motley being the only difference in his description and that of the receiving sheet. He also identified the 1093 and 1098 Red White face cows found at Davidson's place as his and Mr. Massey's. One of these cows he said had a "C" brand on her left jaw. One of them he said he raised and the other was a cow he bought from Jim Loerr. It thus appears he positively identified six cows as belonging to himself, Mr. Massey and Mr Stone. There were four other cows which he identified but the descriptions do not check accurately with the receiving sheet of the Paris Sales Barn. But the weight of the

evidence in any case is for the jury to determine. It thus appears that between Mr. Stone's and Mr. Coker's testimony they definitely identified six cows as theirs or Mr. Massey's. It also appears as hereinbefore pointed out, four of the cattle were sold to Swift & Company and no attempt made to identify them, hence no attempt was made to identify 8 of the cattle stolen. To create an issue of fact for the jury under the information it was necessary to prove the theft of only one of the cows. This proof of the theft of six of the Stone, Coker & Massey cattle was sufficient for submission to the jury.

There was other evidence offered by the state but the foregoing constitutes the gist of the case.

The defendant's case was in the form of a positive denial that he stole the cattle. He positively claimed they were his cattle, that they were rounded up on Tuesday from the river bottom, at the salting and watering place. He attacked the truth and veracity of Clarence Bo Weekly. He further laid the predicate for showing a frame-up. He proved that Charley Cawley, defendant Frank Cawley's brother, ran against George Collins, Sheriff Bird Collins' brother, for County Commissioner and defeated George Collins. He further offered proof that one of Mr. W. R. Stone's daughters had an illegitimate child, and that both he and his son David threatened to kill Frank Cawley on the ground that he was the baby's father, if he was not convicted in this case. Mr. Stone positively denied that he even suspected Frank Cawley, much less having threatened him. In the defendant's case, it appears, Jess Earnest, who drove the cattle truck, was employed by the defendant's brother, Charley Cawley, who was county commissioner. There was also some evidence in relation to failure of Mr. Stone to produce his brand with the little "C", but this maneuver, like the others, did not alter the issue which was, Were the cattle sold at Paris stolen or did they belong to Frank Cawley? Frank Cawley further defended that he took the cattle openly and without attempted concealment, which the record supports, but only constitutes a circumstance for the consideration of the jury, in determining the issue of whether the cattle were stolen. It is by no means conclusive. In fact, it might have been a means of deceit, the boldness of the operation being designed to allay suspicion. Taking the evidence offered by the defendant in its most favorable light, it only created a controversial situation, the solution of which was for the jury. They decided the issue of guilt against the defendant. In this regard it has been repeatedly held:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Criminal Court of Appeals will not interfere with verdict even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts." Lutz v. State, 93 Okla. Cr. 293, 227 P. 2d 692. Lowrey v. State, 87 Okla. Cr. 313, 197 P. 2d 637; Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479.

The answer to this contention is clear, we are of the opinion the evidence is sufficient to sustain the conviction.

Defendant attacks the correctness of the court's instructions. He contends that instruction No. 2 fails to distinguish the statutory crime of larceny, from the statutory crime of stealing, thereby eliminating the burden upon the state to prove felonious intent on the part of the taker of the property to deprive the owner thereof and to convert the same to his own use and benefit. He bases this contention on the authority of Sneed v. State, 61 Okla. Cr. 96, 65 P. 2d 1245, and Crowell v. State, 6 Okla. Cr. 148, 117 P. 883, 885. This contention has been adversely resolved to the defendant's position in McDaniels v. State, 77 Okla. Cr. 84, 139 P. 2d 191, wherein this court said:

"The general larceny statute of this State, Sec. 2253, O.S. 1931, Tit. 21 O.S.A. 1941 § 1701, defines larceny as follows: 'Larceny is the taking of personal

property accomplished by fraud or stealth, and with intent to deprive another thereof.' Sec. 2267, O.S. 1931, Tit. 21 O.S.A. 1941 § 1716 deals with the larceny of domestic animals.

"These statutes create separate and distinct offenses. To support a conviction under the statute on the larceny of domestic animals, it is necessary to prove a felonious intent on the part of the taker to deprive the owner thereof, and to convert the same to his (the takers) own use, which specific proof is not necessary under the general larceny statute.

"The word 'steal,' which is used in the statute on larceny of domestic animals is not defined by statute and therefore is used in its common law meaning.

"When the word 'steal' is used it means to take and carry away the property of another, with the felonious intent to deprive the owner thereof, and to appropriate the same to one's own use.

"The ommission of the word 'felonious' from an instruction is not a fatal defect, if words of equivalent meaning are used, or if the element of felonious intent is otherwise sufficiently expressed. The use of the word 'steal' in an instruction where the statute uses this term, carries with it the meaning of felonious intent."

An examination of the instructions reveals instruction No. 9 expressly met the requirements as to proof of felonious intent on defendant's part to feloniously take, steal and carry away, with intent to deprive the owner thereof and to convert the same to his own use and benefit. Instruction No. 9 completely covered this issue, hence, it is apparent that while instruction No. 2 standing alone might not have covered the issue in light of instruction No. 9 the lack of merit in this contention is obvious. Instruction No. 9 meets the requirement of the law laid down in both of the cases relied on by the defendant as well as in the case of McDaniels v. State relied upon by the state. It is axiomatic that instructions must be considered as a whole, and when so considered together, if they fairly and correctly state the law applicable to the case they will be sufficient. Lamb v. State, 70 Okla. Cr. 236, 105 P. 2d 799.

Next, the defendant complains the court erred in refusing to give an affirmative instruction based on the defendant's theory of the case. It was certainly the defendant's fundamental right to have his theory of the case presented. Linde v. State, 61 Okla. Cr. 136, 66 P. 2d 527; Johnson v. State, 84 Okla. Cr. 368, 182 P. 2d 777. The pertinent part of his requested instruction No. 4 reads as follows, towit:

"You are further instructed in this connection, that a person who takes property openly and avowedly in good faith honestly believing the same to be his, is not guilty of the crime of stealing, even though he is mistaken, and in this, you are instructed that it will be your duty to acquit the defendant, even though you find that some or all of the cattle in question did in fact belong to Stone, Coker or Massey, unless you further find beyond a reasonable doubt that the taking thereof was a felonious intent to deprive the true owner thereof."

It is our opinion the trial court covered defendant's theory in its instruction No. 8 reading as follows, to-wit:

"You are instructed that the defendant Frank Cawley, for his defense, says that he owned the eighteen head of cattle with which he is charged with stealing in this case. If you find from the evidence in this case that the defendant Cawley owned the eighteen head of cattle with which he is charged with stealing, or if you find that he in good faith believed that he owned the said eighteen head of cattle, or if you have a reasonable doubt thereof, then it would be your duty to acquit him."

But the defendant says the court not only failed to present his theory of the defense, but that the trial court placed the burden in its instruction No. 6 upon

the defendant to do three things. First, to prove ownership; second, establish good faith and, third, to raise a reasonable doubt thereof. We cannot agree with this contention. The effect of instruction No. 6 was merely to recite the conditions under which the defendant's possession could be excused first, if they found from the evidence he owned the cattle, or, second, from the evidence they found a basis on which his possession of the cattle could be excused, or if they had a reasonable doubt as to the ownership or the belief of the defendant that he owned the cattle when he took them, they could acquit the defendant. The instruction is both fair and favorable to the defendant and substantially stated his theory. It has been repeatedly held that it is not error to refuse requested instructions which are proper statements of law when such requested instructions are substantially covered by the instructions given by the court. Geyman v. State, 86 Okla. Cr. 348, 192 P. 2d 707; Guthrie v. State, 87 Okla. Cr. 112, 194 P. 2d. 895. Moreover, while this instruction did not put the burden on the defendant to prove his possession, he was at liberty by way of defense to put in evidence any fact to disprove his felonious intent, such as a bona fide claim of right. 52 C.J.S., Larceny, § 121, page 944, Notes 30, 31, 32, 34; People v. Morley, 89 Cal. App. 451, 265 P. 276. Here, such proof constituted the very essence of the defendant's defense. In Smith v. State, 38 Okla. Cr. 416, 262 P. 507, in the body of the opinion it was said:

"It is well established that a defendant charged with a crime which has as one of its ingredients an unlawful intent may explain his intent and mental purpose, and may deny the specific intent required to constitute the offense. Wigmore § 581, says, with the exception of Alabama, the rule is absolute in the United States. See Snow v. State, 3 Okla. Cr. 291, 105 P. 572 |575| ; Cosby v. State, 30 Okla. Cr. 294, 236 P. 51; 8 R.C.L. § 174, p. 181, authorities cited."

It is apparent that the defendant could not avail himself of this rule of law without being willing to assume the burden of the explanation of his possession of these allegedly stolen cattle. Certainly, the court has no right to require a defendant in any case to prove his innocence, but when a prima facie case has been made in a larceny case, ordinarily the defendant must offer proof to excuse his possession of the property proven to have been stolen, or may be convicted on the prima facie proof, and it is not error for the trial court to enlighten the jury as to the grounds on which such possession may be excused. Hence the court did not commit error in instructing the jury as hereinbefore set forth.

The defendant then contends that he was convicted without due process of law. This contention is predicated upon the proposition of the arrest and incarceration of Clarence Bo Weekly before the preliminary hearing, and his incarceration during the trial of the case. In this connection at the preliminary trial it appears that he refused to testify. This refusal was predicated upon the proposition that he had talked to Mr. Welch, of counsel for defendant Frank Cawley, about representing him in this case, and when Weekly took the witness stand at the preliminary trial and "Mr. Welch asked him, 'if you wanted a lawyer and you said yes'. Mr. Welch said, I think you should have one, and then witness said he didn't want to testify". It then appears that the hearing was adjourned and Bo Weekly returned to the jail where they put him in jail in what is called the little cage. Then it appears that Sheriff Bird Collins called Bo Weekly's mother at Lawton, Oklahoma, and told her that Bo was in trouble. It appears that the sheriff arranged for her to come from Lawton because, as he said, "she might help them". She came and the next day Bo Weekly testified at the preliminary proceedings. It appears that Sheriff Collins had known Bo Weekly since practically all of Weekly's life and that Bo Weekly's mother had worked for the sheriff. It is contended that his testimony was obtained because of the intimidation to which he was subjected at the hands of the sheriff and Weekly's mother, and that the trial court erred in not striking it. At the pre-

liminary hearing it is contended by the defendant that the sheriff sat between the county attorney and the witness Weekly on the witness stand so that the sheriff might intimidate him. The record in this regard, however, discloses that before the testimony was commenced the sheriff and the county attorney exchanged places. After the preliminary hearing Weekly was released and went to Texas where he remained until the case came on for trial on its merits. The sheriff admitted that he went to Texas and returned Weekly to Hugo. The sheriff related that when he went after Bo Weekly he told him that he had come after him and asked if he was ready to go and Bo said, "I guess so", and they came back. Immediately upon their arrival in Hugo, Bo Weekly was placed in jail until the trial. The sheriff testified that he thought Bo was charged in the justice of the peace court of M. S. Watson as a material witness but admitted he had no process for him. No attempt was made by the defendant to disprove this when they had the justice of the peace on the witness stand. The record discloses that the sheriff admitted on the witness stand that he had no warrant for Bo Weekly's arrest and put him in jail either time, nor commitment to hold him as a witness. The sheriff and the county attorney both positively denied that they tried to influence his testimony, or that they told him what to say, that their entire effort was designed to obtain from Bo Weekly the truth. In regard to intimidation by his mother, the record discloses that Mr. Bob Jones, bailiff of the trial court, was requested by Mr. Welch, of counsel, to follow Weekly and his mother during a recess of the court and find out what she told Bo Weekly. Mr. Jones testifying for the defense said she told him, "regardless of what happened to tell the truth and not to say anything about Mr. Collins because he didn't have anything against you." The record further shows that on Monday when the court convened the day before the case was called for trial, the court ordered Weekly brought to the courtroom for interrogation by Mr. Hal Welch, who questioned Weekly in the presence of Mr. Welch's stenographer who took down the questions and unsworn answers. Some of the things he said there were at variance with his sworn evidence. The statments therein made were used in cross-examining Bo Weekly. The court will take judicial notice of the fact that in making the statement to Mr. Welch, under those conditions, the witness was by no means under the penalties of perjury and had not been sworn to tell the truth. This evidence forms the basis for the defendant's contention of intimidation and the denial of due process.

The foregoing methods may have prompted the testimony of Clarence Bo Weekly, and they may have been the means of obtaining the truth. Certainly, the county attorney and the sheriff were acting beyond the law in holding Weekly in jail on the two occasions in question without process so to do. When officers so act they no longer are instruments of lawful administration of justice but become a law unto themselves. Of course, the remedy for recompense for unlawful arrest and imprisonment is with Weekly, not this defendant. Furthermore, the facts as hereinbefore related, did not go to the competency of his evidence, but only as to its credibility. If duress or coercion was used to obtain the testimony of a witness, this fact goes to the credibility of the witness. 70 C.J. 769, § 934, Note 68. In People v. Tugwell, 28 Cal. App. 348, 152 P. 740, 743, the situation confronting the California court was identical with the case at bar. Therein it was said:

"It is worthy of remark that this witness was brought into court by means of a most extraordinary kind of subpoena. On the night before he testified he was arrested, handcuffed, and taken to jail, where he was kept until wanted in court. No excuse was made for this outrage. Evidence thus produced was entitled to the smallest credit, but may have been believed."

The evidence thus obtained in the case at bar was entitled to the smallest weight but it was the jury's province to believe it if they so desired. The cases cited by both the state and the defendant are not in point. This prosecution might

have failed, by reversal herein, because of the improper conduct of the officers if it had not been for the strong chain of both direct and circumstantial evidence which amply sustains the conviction. Officers of the law have no right to abuse the law themselves even though it attains the ends of justice. The statutes of the State of Oklahoma make adequate provision for obtaining the attendance of a witness who may not appear at trial and give his evidence in court, in the justice of the peace court, Title 39, § 165, O.S.A. 1941, and other courts. Title 22, § 270 to 275 O.S.A. 1941, inclusive. We suggest that lawful means be resorted to in future cases similar to this one. For all the reasons hereinbefore set forth, the judgment and sentence herein imposed is accordingly affirmed.

JONES and POWELL, JJ., concur.