[Crim. No. 1744. In Bank.—February 18, 1913.]

## THE PEOPLE, Respondent, v. FRANK BAUWERAERTS, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE.—In a prosecution for murder, the evidence is held sufficient to justify the conviction of murder in the first degree.

ID.—ABSENCE OF MOTIVE—REASONABLE DOUBT.—The absence of motive is a fact favorable to one accused of crime, and is to be considered in weighing the evidence against the defendant. But, of itself, it does not, as matter of law, establish innocence or necessarily raise a reasonable doubt of guilt. Its effect is a question for the jury to decide.

ID.—CROSS-EXAMINATION OF DEFENDANT—IMPEACHMENT—CONVICTION OF FELONY—MISCONDUCT OF DISTRICT ATTORNEY—REPETITION OF QUESTION.—The defendant in a criminal prosecution, where he offers himself as a witness, may be asked, for the purposes of impeachment, if he has not been convicted of a felony; and the repetition of the question in different forms, after a negative answer had been given to the first question, will not be deemed prejudicial misconduct by the district attorney, depriving the defendant of a fair trial, where it appears that he was unfamiliar with the English language, especially legal phrases, and his examination indicated an intent to evade a direct answer.

APPEAL from a judgment of the Superior Court of Riverside County and from an order refusing a new trial. F. E. Densmore, Judge.

The facts are stated in the opinion of the court.

A. Heber Winder, and Richard L. North, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

THE COURT.—The defendant was charged with the murder of one Harriet Guyot, in Riverside County, convicted of murder in the first degree and sentenced to death. He appeals from the judgment and an order denying his motion for a new trial.

As grounds for a reversal it is claimed by appellant that the evidence is not sufficient to sustain the verdict, and that

he was precluded from having a fair and impartial trial through prejudicial misconduct on the part of the district attorney.

The evidence in the case shows that the defendant, a native of Belgium, came to the United States a few years ago and toward the end of the year 1911 located in Portland, Oregon. He worked in different capacities in Portland, and during his stay there stopped at a lodging-house kept by one Andre Guyot, son of the woman he was convicted of having murdered. All of these parties became quite friendly. About January 1, 1912, the defendant, who claimed to have some knowledge of prospecting and attracted by reports of gold discoveries in Imperial County, this state, induced the deceased, Mrs. Guyot, to furnish the money for a prospecting tour in that locality. The deceased, a woman aged about fifty-nine years, agreed to go with the defendant, and at her request a friend of hers, a Miss Julia Francois of The Dalles, Oregon, was to accompany them under an arrangement that all should share equally in whatever successes the enterprise attained. All of the parties were natives of Belgium, though unrelated to each other. The defendant was about thirty-seven years of age, and Miss Francois about nineteen years of age. Mrs. Guyot furnished five hundred and fifty dollars for the necessary expenses of the enterprise, which was about the only money the party had. This she turned over to the defendant who acted as treasurer of the expedition, paying all the bills, purchasing all the supplies and retaining control and possession of the money. The party left Portland in January, 1912, and in due time arrived in Brawley in Imperial County. On investigation it was ascertained that the reports of discovery of gold mines there were without merit and after some further investigation it was determined that the party should go up into the Chuckawalla Mountains in the eastern part of Riverside County, where some prospecting had been done and some mining locations made. Proceeding by train part of the way and the rest by wagon the party made their permanent camp about three and one-half miles from Chuckawalla Springs, which point they reached about February 1, 1912. The locality where their camp was made was a remote, lonesome spot, the surrounding country for miles in every direction being a desolate waste of mountains and desert, visited

only by occasional prospectors. The three members of the
party occupied a single tent, the women sleeping together in
the rear while the defendant occupied a bed at the entrance
of the tent. They prospected for gold in the nearby cañons
for about six weeks, but without success, and their supply of
money had diminished to about $117. About the first day of
March, 1912, one M. D. C. Putman, an American, came into
the hills, making his camp about two miles from the camp
of the defendant. Putman was a prospector and had there-
tofore located mining claims near where he camped and had
come up for the purpose of looking after them. He met the
defendant and the women at their camp a day or so after he
arrived. All along after the party had left Portland de-
fendant, when occasion called for it, represented the elder
woman as his mother and the younger as his wife, himself
going under the name of Frank Guyot, and so stated such re-
lationship to Putman. No particular importance, however,
is to be attached to these representations, they being doubtless
made, as stated by defendant, to avoid possible comment and
talk while the party was together. On Friday, March 15,
1912, the defendant accompanied by the younger woman came
to Putman's camp and Putman asked the defendant if he
could let him have some salt of which he was in need. De-
fendant promised to let him have it and on the following Sun-
day, March 17th, about nine o'clock, Putman went over to the
camp of defendant and got it. When within a short distance
of the camp he perceived the defendant moving rapidly back-
ward and forward carrying sand in a bucket and scattering
it near the tent. When defendant discovered Putman ap-
proaching he called to him to wait and he would bring him
the salt, which he did. He appeared nervous and excited.
After handing him the salt defendant stated he would go to
Putman's camp with him and they both started in that direc-
tion. As they proceeded Putman asked defendant how his
wife and mother were and defendant told him that they were
down at the dry washer which the defendant had set up about
a mile below his camp. This statement surprised Putman as
he had passed the dry washer on his way to defendant's camp
and assuming that he might be in that vicinity had called and
had got no answer from any one. He further stated that his
wife and mother were going over to Chuckawalla Springs the

next morning and there catch a wagon that would take them
to the railroad, as his mother was to meet a government en-
gineer in Yuma. Putman testified that his suspicions were
aroused from the peculiar action and conduct of the defend-
ant. He had no weapon in his camp of any character and
he knew that defendant was armed. About noon of that day
—Sunday—Putman left his camp and took his station on a
high hill some distance from the camp of the defendant and
where he could look down upon it. He remained at this point
until about five o'clock in the afternoon observing the actions
of the defendant. When he first reached his point of obser-
vation defendant was engaged with a pick and shovel caving
down a bank some twenty-five feet high a short distance from
the tent. After he accomplished this the defendant then en-
gaged in burning up rags and papers which he brought from
the tent at a small furnace located near it. While so occu-
pied he walked around the tent looking up and down the
wash. When Putman left the hill to return to his own camp
defendant was seated near his tent. At no time during the
afternoon did Putman see either of the women about the
place. Early the next morning, satisfied that there was some-
thing wrong, Putman walked about twelve miles to a camp
where two men were working, told them of his suspicions and
tried to get them to come back with him and investigate the
disappearance of the two women. They could not do so as
they expected visitors that day to their camp, but they loaned
Putman a rifle and cartridges. Putman returned to his camp
that night and the next morning—Tuesday—started for the
camp of the defendant. On the way he stopped at Chucka-
walla Springs where he met two men—Heyman and McCarty
—with the former of whom he was acquainted. Putman told
them of the apparent disappearance of the women and his sus-
picions and the three proceeded to the defendant's camp, which
they found deserted. With a pick and shovel found in the
tent, Putman and Heyman dug into the gravel that had been
caved down from the bank and when they had dug about ten
inches struck a blanket, which they ripped open with a pen
knife and found that it enveloped a human body. No fur-
ther investigation was made and the grave was covered up.
It was then agreed that Heyman, who had seen the defendant
the day before, should go to the railroad station and telegraph

the defendant's description in order to secure his arrest. Putman after investigating for that purpose found in one of the dry washers the tracks of the defendant leading toward Putman's camp. He followed it that far and found on the table in his tent a note from defendant which the latter had left there Tuesday morning. Subsequently a note was also found in defendant's tent which had been left there by him for Putman. In these notes defendant stated that his wife and mother had left the camp on the Sunday Putman was over there, but that he was too sick to go with them; that he had been over to Chuckawalla Springs the day before (Monday); that he had found no trace of a wagon there and that he thought the women had followed the wagon trail of Putman (the latter had come out in a wagon on a return trip from Brawley with provisions a few days before) or the Palo Verde trail; that he was going to find out which trail they had taken and if he did not return in five or six days to take such provisions from his tent as he could use. Putman took up the trail of the defendant from where it left his camp and followed it on foot for about thirty miles toward Imperial Junction to which defendant also on foot was evidently proceeding. Night overtook Putman near Iris, a telegraph station about ten miles east of Imperial Junction. He proceeded to Iris and had the operator there telegraph to Imperial Junction to arrest the defendant for killing his mother and wife. In pursuance of the dispatch the defendant was apprehended on the train as he was about to take it at that place, and Putman that night took the train to Imperial Junction. When arrested the defendant stated that he was on the way to Yuma to employ men to work his mines. After being informed that he had been arrested at the instigation of Putman and when the latter came into his presence at Imperial Junction that night, he accused Putman of having killed the women and compelling him to bury their bodies. After the arrest of the defendant he made a plat for the officers showing about where the bodies of the women had been buried and where other things had been hidden by him, and the coroner and sheriff, accompanied by Putman and others went over to the camp of the defendant where they exhumed the bodies of both Mrs. Guyot and Miss Francois. The body of Mrs. Guyot was found buried under a bank about one hundred feet from the tent

at the spot where Putman, Heyman, and McCarty had discovered it Tuesday morning. The body of Miss Francois was found buried at another spot about thirty feet from the tent. Both bodies were attired in night gowns. A shawl strap had been buckled and some cording wrapped about the remains of Mrs. Guyot and her body was entirely enveloped in a blanket which was held closely in place by hammock cords tied about it. She had been killed by a pistol bullet fired into the base of her brain. Immediately above the spot where the body of Miss Francois was buried a large quantity of ashes were found, the remains evidently of quite a large fire. Her body was also wrapped in a blanket and in addition a mattress was wrapped around it tightly corded. She had been shot through the right arm and through the head. There was also found buried near the tent two suit cases containing women's clothes, and some women's clothing and a man's overcoat were also found buried. All the bedding used by the women had been buried with their bodies, and in and about the tent were no articles of clothing or effects to indicate that any women had ever occupied it, and fresh sand and gravel had been strewn about the floor inside the tent. It appears further that the defendant on Monday morning, March 18th, went to Chuckawalla Springs, where persons going and coming through the country necessarily stopped for water. He met the witness Heyman there who with the witness McCarty had reached the wells the day previously about one o'clock in the afternoon and were camped there. McCarty was away when the defendant came. Defendant asked Heyman if there had been a light wagon there drawn by two horses and was told that there had not. Defendant then said that his wife had told him at one o'clock Sunday that the wagon had come and that ''they had got ready right away and left.'' Heyman and defendant looked around for possible tracks of a wagon but found none. Heyman told the defendant that if he believed the women had become lost he would aid him in trying to find them, but defendant said they had probably taken another trail and let the matter rest at that. He remained about an hour and started back to his camp. There were other circumstances of minor importance tending to show the defendant's guilt which we do not think it necessary to mention.

The facts related in the foregoing statement constitute legal evidence of the defendant's guilt sufficient to justify the verdict. The testimony of the defendant, and his claim prior to the trial, to the effect that Putman was the guilty person is not entirely credible, in itself, and it is in many respects inconsistent with the facts established by the testimony of other witnesses at the trial. The question of Putman's credibility and veracity was for the determination of the jury. They believed Putman, as they had a right to do. The attempt to impeach Putman's reputation for truth resulted in disclosing that, after the homicide and after the defendant's statement that Putman had committed the murder had got abroad in the village of Brawley, the tongues of a few gossips became busy and made a reputation for Putman which he did not have before. The attempt was met by that of a number of witnesses who had known him for many years to the effect that he was a man of good repute and character. The proof does not show any adequate motive for the crime. The absence of motive is a fact favorable to one accused of crime, and is to be considered in weighing the evidence against him. But, of itself, it does not, as matter of law, establish innocence or necessarily raise a reasonable doubt of guilt. Its effect is a question for the jury to decide. We find no reasonable ground for the claim that the evidence does not sustain the verdict.

During the cross-examination of the defendant the district attorney asked this question: ''I ask you if you were not in the first tribunal court of Brussels, Kingdom of Belgium, on or about the 26th of February, 1904, convicted of a felony, embezzlement?'' He answered: ''No, sir.'' Afterward he was recalled by his counsel for further examination and thereupon the district attorney made a further cross-examination. At the close of this cross-examination he asked leave to renew the above inquiry as to a former conviction, saying that he did not think the witness had understood the question. Leave being given, the defendant was then asked: ''Do you know what a felony is?'' He answered, ''No, sir.'' The court then, at the district attorney's request, explained to the defendant the meaning of the word ''felony.'' Thereupon the following examination took place:

''Q. Were you not, in Brussels, Belgium, just a year or so before you came to Canada, convicted of a felony?

"A.  No, sir; I never noticed it.

"Q.  Were you ever convicted in the criminal court of Brussels, Belgium, sentenced to punishment in the state prison for five years?

"A.  No, sir; by golly, no.  I stand right up upon that. Five years?  No, sir.

"Q.  Were you not in the criminal courts of Belgium convicted of a felony and sentenced to the state prison?

"A.  No, sir.  No.

"Q.  You were not?

"A.  I know nothing about that."

The district attorney had received from the commissioner of police in Brussels a letter, the date of which does not appear, stating in substance that the defendant had there been convicted of a felony.  The information was filed on March 29, 1912, and the trial was begun on May 21, 1912.  No record of the conviction of such felony was introduced or offered in evidence.  It is not claimed that there was time within which to obtain such record after the receipt of the letter.

Where the defendant offers himself as a witness he may be asked, for the purposes of impeachment, if he has not been convicted of a felony.  (Code Civ. Proc., sec. 2051; *People* v. *Johnson,* 57 Cal. 573; *People* v. *Crowley,* 100 Cal. 482, [35 Pac. 84] ; *People* v. *Sears,* 119 Cal. 271, [51 Pac. 325].)  The defendant's counsel concede this, but they argue that the repetitions of the question in different forms, after the negative answer had been given to the first question, would naturally lead the jury to infer that the district attorney had in his possession some authentic information to the effect that the defendant had been so convicted, and that therefore, such repetition constituted misconduct prejudicial to the defendant, depriving him of a fair trial.  They do not assert that the district attorney intended to produce this belief by the jury, but they claim that it is prejudicial misconduct of itself regardless of his motive or purpose.  The previous examination of the witness, his unfamiliarity with the English language, and the form of the answers to the questions as above given, sufficiently exonerate the district attorney from any charge of an improper purpose.  There was no impropriety in the repetition of the question, under the circumstances existing. The defendant, while able to speak fluently, was evidently un-

familiar with English, especially the legal phrases used in a court room. The answers furnish some indication of an intent by him to evade a direct answer. The cases from this state, cited by counsel in support of this point, involved questions put by the district attorney tending to elicit incompetent or irrelevant evidence of a character injurious to the defendant. Whether the repetition of a proper question may constitute misconduct in any circumstances, sufficient to call for a reversal, we need not determine. We are satisfied that under the circumstances shown in this case no cause for reversal upon that ground exists.

The claim that the district attorney was guilty of misconduct in exhibiting to the jury, while he was asked the foregoing questions, the letter from the commissioner of police of Brussels, above mentioned, is not sustained by the record. The letter was written in the French language and it does not appear that it would have conveyed any information to any juror had he seen it. The evidence taken on the hearing of the motion for a new trial on this subject, shows that the district attorney did not mention the letter, or show it to the jury, or have it in his hands while asking these questions. In the examination no reference was made to such letter. The affidavits of the jurors state that they knew nothing about the letter and that it was not referred to during their deliberations. There is also a claim that the district attorney was guilty of misconduct in exhibiting the same letter to a newspaper reporter immediately after the jury was charged and while they were filing out of the court room, this being done in close proximity to their line of march. The affidavits of the jurors above referred to show that this exhibition, if it was known to them at all, produced no effect upon them. Counsels' surmise that it may have done so is not worthy of consideration. These are all the points made in support of the appeal. An examination of the record discloses no other objections worthy of mention.

The judgment and order are affirmed.

Beatty, C. J., does not participate in the foregoing.