[Crim. No. 6406. Second Dist., Div. One. Mar. 31, 1959.]

THE PEOPLE, Respondent, v. GINGER PROCTOR, Appellant.

Joseph T. Forno for Appellant.

Edmund G. Brown, Attorney General, and John M. Huntington, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of the crime of grand theft (Pen. Code, § 487, subd. 1), in that on or about August 8, 1957, she did wilfully, unlawfully and feloniously take a cashier's check of the value of $1,500, the personal property of T. W. Abernathy.

Defendant pleaded not guilty, waived trial by jury and pursuant to stipulation the cause was submitted on the transcript of the proceedings had at the preliminary examination, with the right to offer additional evidence reserved by both the prosecution and defense. Following a reading of the aforesaid transcript and the consideration of additional evidence, the court adjudged defendant guilty as charged. Her motion for a new trial was denied and conditional probation granted. From the judgment and the order denying her motion for a new trial defendant prosecutes this appeal.

As to the factual background surrounding this prosecution the record reflects that T. W. Abernathy was president of Pacific Rolling and Engineering Corporation, operating a manufacturing business. E. W. Richardson was vice-president of said corporation. It appears that Messrs. Abernathy and Richardson were also operating a business known as Precision Rolled Products, Inc. On March 25, 1957, defendant entered the employ of the last named company. She was employed by the aforesaid Mr. Richardson in a secretarial capacity. After working there for about a day and a half she was informed that, "We have another small company that you're to take care of—It's Pacific Rolling & Engineering." Defendant continued in this employment until August 9, 1957. She was employed by Mr. Richardson who was her immediate superior. About a month and a half after her employment commenced defendant told Messrs. Richardson and Abernathy that she felt she was entitled to more salary and was informed that they would give her an increase. Her starting salary had been $350 per month, and about three months after she had been there her salary was raised to $400 monthly. Mr. Abernathy testified he had seen a cashier's check issued by the Sun Valley Bank on June 21, 1957, in the sum of $1,500, and which check was introduced into evidence and hereinafter referred to as People's Exhibit 1. There were three cashier's checks purchased in the name of the witness. Two for $1,500 each, and one for $1,250. Four were purchased in Mr. Richardson's name. Three for $1,500 and one for an odd amount which he did not remember. They were purchased with

money from the Pacific Rolling and Engineering, Inc. account. He purchased the checks that were in his name, and Richardson purchased the checks that were in his name. The checks were given to defendant, and she kept them in a file. They were not endorsed.

People's Exhibit 1 was not deposited by the corporation. It was found to be missing on September 16. The witness did not give anyone permission to take this check. When defendant left on August 9, he did not go over her account with her.

E. W. Richardson, vice-president of Pacific Rolling & Engineering, Inc., had seen the cashier's check. He purchased the check through the business. The check was turned over to the bookkeeper, who was defendant. Aside from giving the check to her as bookkeeper, he did not give her the check to be used for her personal use. The check was not taken with his permission from the business. He purchased a number of checks at the same time in June. The checks were not endorsed. The bookkeeper took care of keeping the correct amount in the bank to cover checks. The checks at various times were put on his desk for signature to cover the account as it was needed. He did not recall when he endorsed this check. It was sometime between June 21 and August 9. Deposits were made to the account on the other checks, except People's Exhibit 1. He did not endorse this check and give it to defendant shortly before she left his employment. He endorsed it for deposit in the bank.

Frank Cortese, a builder and land developer, knows the defendant. On September 8, 1957, he took this cashier's check as a deposit on a home. He sold appellant a "package,-property and a home to be constructed on that property." The check marked People's Exhibit 1 was given to him by defendant as a down payment on this transaction. His signature is on the back as he endorsed the check for deposit. He made out a deposit receipt which states he received from Lloyd G. and Ginger Proctor the sum of $1,500. On the back of the deposit receipt is a notation, "I authorize G. C. Builders to give Mr. Richardson $1,500, Lloyd G. Proctor and Ginger Proctor." Mr. and Mrs. Proctor placed the notation on this document and signed it. This was done one week after the transaction. The transcript is not too clear as to the reason for or purpose of the notation on the back of the deposit receipt. In that regard we find the following testimony given by Mr. Cortese who received People's Exhibit 1 from defendant Proctor and her husband:

"THE COURT: What reason did they give you for entering it. That is the question. Did they give you any reason?

"THE WITNESS: Did they give me a reason for entering into it?

"THE COURT: That is the question. What reason did they give you? While they are there with you putting the signature on the back of the check. Keep on following down the line, if any at all.

"THE WITNESS: Well, yes, there was a reason.

"THE COURT: Did they tell you about the reason? That is what he wants to know, what they told you.

"THE WITNESS: Well, Mr. Proctor had called me after he had a call from Sergeant Yocham and Sergeant Grant.

"MR. FORNO: If he is going into a conversation with Mr. Proctor this would be hearsay, your Honor.

"THE COURT: I will strike the answer.

"THE WITNESS: All right. Well, then——

"THE COURT: What reason did they give you to authorize you to enter into this transaction?

"THE WITNESS: Well, they gave me their authorization to give him the money.

"THE COURT: Give who the money?

"THE WITNESS: Mr. Richardson; so they gave me a release; actually, this was supposed to be a release.

"THE COURT: Release of what?

"THE WITNESS: Of the deal, and I gave Mrs. Proctor my check for $1,500.00 because the cashier's check had already cleared, so that's actually——

"THE COURT: It wasn't all done at the same time, then, was it?

"THE WITNESS: Pardon me, sir?

"THE COURT: That notation, that reason you are giving me, is after the transaction.

"THE WITNESS: One week later.

"THE COURT: When they returned the $1,500.00 over to you.

"THE WITNESS: One week later.

"THE COURT: One week later."

On September 18, 1957, Mr. Abernathy had a conversation with defendant. He called her on the telephone at her home. He asked her if she knew anything about the check. She denied that she knew anything about it. He asked her if she knew a Mr. Cortese, and she said no. He told her that Cortese cashed a $1,500 check of theirs which Cortese claims she gave him. Defendant said she knew nothing about the check and

had not purchased a home from Mr. Cortese. She asked him if Woody (Mr. Richardson) knew anything about it, and he said, "Yes, he is on the phone." She asked where she could contact Mr. Cortese and he gave her his telephone number. She was to call him and then call them back.

John Grant, investigating officer for the Los Angeles Police Department, had two conversations with defendant. On September 20, Sergeant Yocham and Officer Grant went to Mrs. Proctor's home. They asked her if she would care to tell them about the check. She said, "You didn't see my name on it, did you?" They told her it was not necessary for her name to be on the check and they wanted to get her side of it. She said, "I want to call Joe." She dialed a number to someone known as Joe. Later she stated it was Attorney Joe Forno and she didn't want to say anything until she could talk to her attorney. A little later she finally said, "Well, I've got enough on those guys to close their doors," "We'll just see what happens." They asked, "Well, what do you mean?" She said, "Some of their shady deals." They said they would like her to come down to the station, and they would contact Mr. Richardson and Mr. Abernathy.

They did so and waited for Mrs. Proctor's husband to come home. They went to the Valley Police Station. Mr. Richardson, Mr. Abernathy, Mr. and Mrs. Proctor, Sergeant Grant and Detective Yocham were present. Defendant confronted Mr. Richardson stating, "You gave me that check for some of your shady deals." Richardson denied this. The conversation continued about Mr. Richardson giving her the check. The officers told all present that they had a wire recorder going. They asked defendant and Mr. Richardson if they would care to talk in another room. They then had defendant and Mr. Richardson go into another room. They also recorded that conversation.

Richardson testified to having the conversation when he and Mrs. Proctor were in the room alone. The discussion was that this money was company funds and under no circumstances would he have any authority to dispense any funds; that defendant's charge that he gave it to her was ridiculous. She said, "Well, if I confess to this will the charges be dropped?" He said, "I cannot promise anything." He did not tell defendant not to say anything to Mr. Abernathy about giving her this check and endorsing the check to her. He was aware that the conversation was recorded.

Officers Grant and Yocham brought coffee up to Mr. Rich-

ardson and defendant. Officer Grant said, "Now, look, Mrs. Proctor, I want to know the truth. How did you get the check?" Defendant then said, "All right, I'll tell you. I took it. In a moment of temptation, as they were before me. I took one of them. What are you going to do about it?"

Sworn as a witness in her own behalf, defendant testified regarding her employment as hereinbefore narrated; that she requested pay for overtime and extra working hours, but Messrs. Abernathy and Richardson told her they did not feel that their business warranted payment for the extra hours overtime she worked each day. That while she was employed as aforesaid, and about June 21, some cashier's checks were purchased. She did not recall the exact amounts thereof. It was close to $7,000. Part of the checks were drawn to Mr. Richardson and part to Mr. Abernathy. The cashier's checks were turned over to her for safekeeping, and they were not endorsed. She would always make the daily deposits to cover whatever payouts she had made for that period. If they had a payroll to meet, she would make a deposit to cover that payroll. She used one cashier's check to cover the payouts, and she might have used two. At no time while she was employed did she receive a $1,500 cashier's check that was endorsed by Mr. Richardson that she was to deposit in their account and that she failed to so deposit. On Thursday, August 8, a $1,500 cashier's check that was endorsed was given to her. This was the day before she left, and Mr. Richardson gave it to her. That morning Mr. Richardson had asked her to deposit all the money that she had into the account of Precision Rolling Products. Mr. Abernathy was out of town so she told Mr. Richardson that she couldn't. He said he intended to merge the companies. She said, "If we do merge these companies, do I still have a job?", and Richardson said, "Well, we'll see about that." She said, "Well, otherwise I intend going to the Labor Commissioner for the overtime pay that I have, and the fact I was never paid from one of your companies." She had added up all the pay she felt she had coming and it totaled $1,531.62. He said that he would pay her for her overtime and make it right if she "would stick by him until they got to the end of this thing." Richardson said, ". . . we'll doctor this $1,500.00 check up so that . . . Mr. Abernathy won't know . . . how this all took place; because things are in such a mess." That she talked to Mr. Abernathy the day she left, but she did not tell him about this for the simple reason that she felt she had the pay coming. At no

time from June 21 until August 9, the day that she left, did Mr. Richardson give her a cashier's check in the amount of $1,500, which he had endorsed, and told her to deposit to the bank account of either Pacific Rolling or Precision Rolled Products, Inc. that she did not deposit. The check that was given to her by Mr. Richardson she gave to Mr. Cortese as a deposit on a house.

As her first ground for reversal appellant earnestly urges that the evidence is insufficient as a matter of law to sustain the judgment of conviction in that the evidence itself establishes a defense under section 511 of the Penal Code as a matter of law. The section just cited reads as follows:

"Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him."

Appellant insists that the evidence points unerringly to the single conclusion that she appropriated the property openly and under a claim of title in good faith. Appellant asserts that she had demanded payment for overtime and was informed by her employer that at the time of such demand the company was not in position to pay, but that on the date of termination of her employment she again demanded payment for overtime which amounted to $1,531. That Mr. Richardson said "he would pay her the overtime with the $1500.00 check" (People's Exhibit 1). That it was endorsed in blank by the payee (Mr. Richardson), and when delivered to her transferred title thereto. However, this testimony was contradicted by Mr. Richardson who testified he did not give the check to appellant shortly before she left her employment, but had endorsed it for deposit in the bank. Whether appellant took the check openly, in good faith and under claim of title, is a question of fact for determination by the duly constituted arbiter of the facts, and such a claim does not depend solely upon whether the claimant believes he was acting lawfully, but the surrounding circumstances must reasonably indicate good faith (*People* v. *Clemmons*, 136 Cal.App.2d 529, 535 [288 P.2d 1021]). It is fundamental that the credibility of witnesses is committed to the trial court, and in the instant case the trial judge was not required to believe appellant's version of the transaction. That the trial judge was not impressed with the verity of appellant's testimony of how

she received the check is evidenced by his statement when rendering his decision as follows: "Well, frankly, gentlemen, the Court just does not believe the testimony of the defendant in this matter . . . This woman converted to her own use the sum of $1,500.00 that was not hers." There is also present the element that the taking by appellant was not "openly and avowedly" as required by Penal Code, section 511, because by her own admission she did not tell Mr. Abernathy. Then, there is appellant's statement at the police station: ". . . I took it (the check). In a moment of temptation as they (the checks) were before me. I took one of them. What are you going to do about it?"

In the final analysis, at most, appellant claims the proceeds of the check here in question as an offset against a debt due her for overtime wages. This is not a defense contemplated by section 511 of the Penal Code, which does not excuse the unlawful retention of the property of another to offset or pay demands held against him (*People* v. *Morley,* 89 Cal.App. 451, 455 [265 P. 276]). As was said in *People* v. *Ranney,* 123 Cal.App. 403, 409 [11 P.2d 405]: ". . . The defendant had money in his possession which he claims belonged to the company, and which he sought to retain to pay a demand for commissions which he asserts were due to him from the company. He had no right to help himself to the funds of the company, even to pay an acknowledged debt. The latter portion of Section 511, *supra,* declares that the provision of that section, 'does not excuse unlawful retention of the property of another to *offset or pay demands held against him.*'"

 Finally, appellant contends that the evidence is insufficient to establish a fraudulent intent upon her part. The rule is now well established that an appellate tribunal is not authorized to reverse a conviction upon the ground of insufficiency of the evidence unless it be made clearly to appear that upon no hypothesis is there sufficient substantial evidence to support the conclusion reached in the court below (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]).

 Appellant concedes "that the only tenable theory under which the charge of grand theft, in the cause herein, could be prosecuted, was embezzlement." The elements of the crime of embezzlement are:

(1) The accused must be the agent or the bailee of the prosecuting witness in holding the allegedly embezzled property;

(2) The property must actually belong to the alleged principal;

(3) It must be lawfully in the possession of the accused at the time of the alleged embezzlement;

(4) The accused must have been guilty of the conversion which the statute denounces. (Pen. Code, § 503);

(5) There must be shown an intent on the part of the accused to deprive the owner of his property unlawfully.

(*People* v. *Hewlett*, 108 Cal.App.2d 358, 367 [239 P.2d 150]; *People* v. *Cannon*, 77 Cal.App.2d 678, 689 [176 P.2d 409].) (See also: Pen. Code, § 503.)

■■■ Since appellant was the secretary and bookkeeper for Pacific Rolling and Engineering, Inc., whose funds were lawfully in her possession as part of her duties, and she used a cashier's check which was company funds as a down payment on a house, there would appear to be no dispute concerning the first four elements of the offense. However, appellant challenges the presence of the fifth element in the case at bar, in that there was no proof of unlawful intent. In this regard, appellant urges that the only evidence presented by the prosecution to prove intent was the incriminatory statement made by her and that these admissions were admitted into evidence before the corpus delicti was established. With this latter contention we cannot agree. ■■■ While it is well settled that the corpus delicti must be proved aside from the extrajudicial admissions of the accused, it is equally well settled that slight or prima facie proof of the corpus delicti is all that is necessary. It may be proved by circumstances shown in evidence or by inferences drawn from facts shown. The rule requiring proof of the corpus delicti before the admission of extrajudicial admissions or statements is thus stated in 8 California Jurisprudence, section 303, page 235: " 'To authorize the reception and consideration . . . of evidence of an extrajudicial confession or admission of a defendant, the people need not establish the corpus delicti by proof of the clear and convincing character required to support a conviction. It is sufficient if there is some proof, or prima facie proof, or even slight proof of the corpus delicti. The uncorroborated testimony of a witness is sufficient to establish the corpus delicti for this purpose . . . ." ■■■ Also, in the case at bar there would have been no error since order of proof is discretionary with the court and, where the corpus delicti is finally established, a mere variation in the order of proof cannot be said to result in any prejudice to the defendant's rights. (See *People* v.

*Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12] ; *People* v. *Ives,* 17 Cal.2d 459, 463, 464 [110 P.2d 408] ; *People* v. *Cullen,* 37 Cal.2d 614, 624, 625 [234 P.2d 1].) Guided by these rules it seems manifest to us that in the case now engaging our attention, the circumstances in evidence established a prima facie showing of the corpus delicti sufficient to allow the court to consider appellant's admissions in determining the question of her guilt.

■ As to appellant's intent, that too may be inferred, and "is manifested by the circumstances connected with the offense . . ." (Pen. Code, § 21). This is so because intent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred. We have hereinbefore narrated in detail the evidentiary features of this case, and need not here repeat them. Suffice it to say that aside from any of appellant's admissions, facts were adduced at the trial from which the trial judge could, as he did, reasonably infer criminal intent. The court was also entitled to consider appellant's contradictory statements and other admissions on her part. ■ Guilty knowledge, as well as intent to violate the law, may be shown by the conduct of the accused, including false or misleading statements made to police officers or others with regard to material facts *(People* v. *Turner,* 86 Cal.App.2d 791, 801 [195 P.2d 809] ; *People* v. *Roche,* 49 Cal.App.2d 459, 462 [121 P.2d 865]). ■ We entertain no doubt that under the facts of this case the trial judge was justified in his conclusion that appellant took the cashier's check with criminal intent.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.