[Crim. No. 7256.   Second Dist., Div. Three.   Jan. 11, 1961.]

THE PEOPLE, Respondent, v. HARVEY MILLER, Appellant.

P. Basil Lambros and Samuel Z. Winnikoff for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and John F. Foran, Deputy Attorneys General, for Respondent.

FORD, J.—The defendant was convicted of the crime of grand theft. (Pen. Code, § 487, subd. 1.) He has appealed from the judgment and from the order denying his motion for a new trial.

It is asserted that there was prejudicial error in the manner in which inquiry was made as to a prior conviction of a felony

in the course of the cross-examination of the appellant. It is further contended that the evidence was not sufficient to sustain the conviction. It is, therefore, necessary to summarize the evidence.

Dorothy Grace Quinn was the person whose property was alleged to have been the subject of the theft. About March 20, 1959, she moved into a duplex on Ventura Boulevard which she had rented. Mr. Paonessa represented the owner, Mr. Capponi. Shortly thereafter she met the appellant when he was constructing some stairs on the premises for the owner. He asked her if she was interested in buying the property. She said that she was but she did not think she would have enough cash for the down payment. The appellant said he thought he could get it for her for a $700 or $800 down payment on a total price of $8,500. He said he was representing the owner. After several conversations, on April 6, 1959, at his request she gave him a down payment of $250 by means of a check payable to his order. He prepared the check and she signed it. On the back thereof, he wrote and signed a statement to the effect that it was a deposit for the purchase of the property at a price not exceeding $8,500, subject to the approval of the owner. Several days later, he told the witness that everything had been arranged, that she was to give him the balance of the down payment, that he could have the papers brought to her, and that it was "set up" for escrow. He said he had talked to Mr. Capponi. The appellant was then given her check dated April 8, 1959, made to his order for $500. Her sister went with him to the bank on that date to have it cashed. When he was given the check, the appellant wrote on the back of his business card and signed a statement as follows: "Received from Dorothy Quinn $500.00 which I am holding as balance of down payment on 11154 Ventura Blvd." He brought her no escrow papers thereafter but did bring a piece of writing paper that appeared to have Mr. Capponi's signature on it. It was therein stated that the price was $8,700 and that there would be no escrow and no termite inspection. She would not accept such terms and the appellant said he would take the paper back and get it straightened out. Within a day or two he returned with Mr. Paonessa. The latter said she still had $500 to pay. She replied that she had already given that to the appellant. Mr. Paonessa said he had not received it. The appellant took her to one side and told her, "Please do not tell Mr. Paonessa that you have given me any money yet." She refused his request because the money should be in his hands.

On another occasion, both Mr. Capponi and Mr. Paonessa came to see her. Later the same day the appellant came alone and told her that he had spent the money and was very sorry but that he would try to make restitution. That was about August 14, 1959. The appellant was arrested the next day. Of the money that the appellant received from her, only $225 was transmitted to Mr. Capponi. She never bought the property but was given credit for $225 on the rent.

On cross-examination, the witness said that on the day she rented the house Mr. Paonessa talked to her about buying the property but she did not think she had enough cash for a down payment. Mr. Paonessa told her that he was representing Mr. Capponi. She gave Mr. Paonessa cash for the rent for the first month but thereafter paid her rent directly to Mr. Capponi by check. When the appellant first talked to her about the property at her restaurant, he told her he had heard she was interested in buying the property. He said he thought he could work out a deal with Mr. Capponi; that they were very good friends; that he had worked for Mr. Paonessa for 15 years; and that he was sure he could get the property for around $8,500, with a down payment of about $750, if she could "come up" with that much money. He did not say he was a representative of the owner. Aside from the $225 credited on her rent, the appellant had given her back a total of $175, $125 having been given to her a day or two before the trial. The appellant was going to build a new building on the property. She had seen plans for such construction but she never ordered the plans. A Bob McKay came to see the property with the appellant and she told him she wanted no building done on the property until it was in her name. She did not retain the appellant to build a retaining wall, although he did build one. He did not present her with a bill for the wall. On one occasion, when she thought the deal was going to be completed, she made a loan of $50 to the appellant "to pay his help." She gave him that because he had the wall built when she got up that morning. She told him, "All right, I will advance you $50 and if this deal goes through then that will come out of your commission for selling the property. . . ."

Antonio Capponi testified that he owned the property involved and that Mr. Paonessa was managing it for him while he was sick. He himself received nothing from the appellant as a deposit on the property. The appellant never talked to him about selling the property; he never agreed to sell it and did not want to dispose of it. But he did sign a receipt for

$225 when Mr. Paonessa asked him to do so. That receipt contained the following language: "Received from Mrs. Quinn $225.00 as deposit on house on premises 11154 Ventura Blvd. Studio City, Calif. Sale price $8,700.00 Payable $225.00 now, $525.00 on or before April 25, 59 [;] buyer takes property subject to 1st TD. [trust deed], payable to Bank of America in an approximate amount of $3,400.00. $4,600 Seller to take back a trust deed for 2 years payable 1% per month on principal, at 8%. Escrow to close on August 10, 1959." Mr. Paonessa introduced him to the appellant. Mr. Paonessa told him that he had a sale of the property to Mrs. Quinn.

Ada I. Dellinger, the sister of Mrs. Quinn, testified that the appellant said he believed that, "being friends," he could obtain the property for Mrs. Quinn with a small down payment. On one occasion he said, "If I have some money I will go over and discuss it with them." He further said, "If I have something to offer him maybe we can get it." When she asked him about the $500 which had been given him, he stated that he had spent it. The appellant showed her a floorplan which, he said, he had had a friend make; the witness' sister never ordered it. The witness identified a paper as the one which the appellant brought when he came in the company of Mr. Paonessa.[1] The paper was dated about April 13, 1959. About that time she saw the plans which the appellant brought. On the plans was the date of April 14, 1959.

Ralph D. Paonessa, an attorney at law, testified that during March and April he was managing the property for Mr. Capponi. About April 13 or April 14, the appellant approached him and wanted to know if Mr. Capponi would sell

---

[1] The description of that document as found in the reporter's transcript is as follows: " 'Dear Mrs. Quinn: Received deposit of $250 on house and premises located at 11154 Ventura, North Hollywood. House being sold in its present condition, and as it now is; and buyer accepts same and waives termite clearance. Total price $8,700—there is now due approximately $3,400, trust deed in favor of the Bank of America. Buyer accepts the property subject to the above trust deed. The further sum of $500 is to be paid on or before April 24, 1959. Seller will accept second trust deed for the difference of approximately $4,500 in equity. It is further agreed seller will supply reasonable additional moneys to the buyer for the construction of a store and office above said store on Ventura frontage of lot. Cost of said improvement to be an agreed amount.' (And then it says in writing there) 'To be agreed by buyer and seller.' And then there is 'RP' initials on there. . . . 'Plans to be approved by buyer and lender. Seller or lender to receive eight per cent interest, and loans to be for a period of two years, payable in monthly installments of one per cent [and] interest on principal amount. Seller reserves right to increase the amount of present existing trust deed.' "

the property. The witness said that he thought that Mr. Capponi did not want to sell the property but, perhaps, he might consider it if he received cash. The appellant said that Mrs. Quinn was interested in buying it. Thereafter he gave the witness $225 as a deposit on the property. The witness believed that the date of his receipt was April 14, 1959. Thereafter, Mr. Paonessa told the appellant that Mr. Capponi did not want to sell the property. The appellant never gave $500 to Mr. Paonessa. Prior to April 13, the appellant asked the witness to draft a form of a letter which the Quinns could use if they wanted to buy the property; the witness did so. This was before the witness received a deposit of $225; the appellant was going to get a deposit and the witness told him to take it subject to the approval of Capponi. At the time the witness went with the appellant to see Mrs. Quinn, he did not know that she had given $750 to the appellant. He further testified: "I never gave him authority to sell the property, but after the receipt was made for $225, I took the matter up with him and I said, 'Mr. Capponi, you are a sick man. Why don't you dispose of it?' That was my suggestion to him." The witness gave the appellant no authority to accept the $500. On cross-examination, the witness said that about the first part of April he told the appellant of Mrs. Quinn's interest in the purchase of the property. He said to the appellant that, when they went into escrow, he should have cash because Mr. Capponi did not like checks. He believed he made a similar statement as to the down payment. The witness had known the appellant for about 15 years and had "represented him in a few matters." Around April 11 or 12, the witness told the appellant that Mr. Capponi might take about $8,700 for the property.

Thomas L. Rogers, a police officer for the city of Los Angeles, testified that the appellant told him that he had spent the money he had obtained from Mrs. Quinn. The officer said that he thought the appellant stated he had lost it in Las Vegas.

Gerald G. Cohen, a police officer for the city of Los Angeles, talked to the appellant on August 14, 1959. The appellant said that he kept the money which he had obtained from Mrs. Quinn. He further said that he did not have permission from anyone to accept a down payment on the property or offer it for sale.

Robert McKay, a draftsman, who had known the appellant since the latter part of 1958, testified on behalf of the appellant. During the first part of April, 1959, he had a meeting

with the appellant and Mrs. Quinn at the property. There was a conversation with respect to the construction of a small building on the front of the lot. Mrs. Quinn expressed her ideas. As a result of the conversation, he prepared a plan for Mrs. Quinn. She, and not the appellant, ordered the plan, but she never paid for it. Before he prepared the drawing, he told her the price would be $165. When the drawing was completed, the appellant took it to Mrs. Quinn on April 14, 1959. He did not see Mrs. Quinn after that. A typewritten bill was sent with the plan. Thereafter he never sent her a bill. He further testified: "To me, my interpretation of client is the person the building is for. Oftentimes other various parties mix in it. I say she was the client because it was designed for her. She made suggestions on the layout and so forth." Ultimately, he received $165 from Mr. Miller, the appellant, in January or February, 1960. Mr. McKay stated that "we had it settled between us that he would make it good," but the witness did not believe that he ever told the appellant that he was "holding him responsible for these plans." He asked the appellant to get the money from Mrs. Quinn.

The appellant testified at length in his own behalf. He met Mrs. Quinn in April or, perhaps, the latter part of March when Mr. Paonessa took him to the property so that the appellant could "advise him on what could be done with it." He had known Mr. Paonessa about 14 or 15 years and dealt with him "constantly off and on" until August or September 1959. Mr. Paonessa wanted him to "give him an idea of how it [the property] could be developed to the extent to where he could sell it profitably." Although he had told Mr. Paonessa that the cement work would cost $1,000, he was only paid $800; Mr. Paonessa said Mr. Capponi would not pay any more. Mr. Paonessa said, "You will make it back on building the house on that property and other work there." He told Mr. Paonessa that he would try to find a buyer for the property and suggested that a little store and, perhaps, an apartment above it could be built on a portion thereof. Before he had done any work on the premises, Mr. Paonessa had informed him that Mrs. Quinn was a good prospect and was interested in buying the property. Mr. Paonessa said, "We will ask $8,500." The appellant's interest in the matter related to the building of a store building on the front of the lot; he testified that "it was not a big project but it was profitable and I was glad to do it." Mr. Paonessa gave him permission to negotiate with Mrs. Quinn and he did so. At that time, the ap-

pellant thought that Mr. Paonessa was the owner. After talking to Mrs. Quinn, he discussed the matter of a down payment with Mr. Paonessa who said, ''Get the $750 and that will be enough, and she can assume all the other payments.''

On April 6, when he received $250, the appellant asked Mrs. Quinn for some money so that he could ''tie the property up and get them to commit themselves to sell it to her.'' On April 8, he obtained the $500 because Mr. Paonessa told him that if he could ''get the money together,'' he would discuss the matter with Mr. Capponi. At the time he received the $500, he intended to hold it as a down payment on the property. When he met Mr. Paonessa, he told him he would give him only part of the $750 then and, when Mr. Capponi was ready ''to go through with the deal,'' he would give him the remainder. On April 13, Mr. Paonessa prepared the ''sales letter'' for him. It was not signed. The appellant took it over to Mrs. Quinn. The appellant did not tell Mr. Paonessa that he would give him the remaining $500, but he told him that he wanted Mr. Paonessa to ''straighten out'' with him and he ''would go through with it.'' At that time Mr. Paonessa owed him ''the $200.''

Prior to April 13, 1959, the appellant built a wall in the rear of the lot for Mrs. Quinn. She had complained to him that there was water under the house and he explained how it accumulated. He told her she needed the wall. The steps were being constructed at that time. She told him to build the wall if it would keep the water from coming under the house. He told her that even if she did not buy the house but just rented it, ''it was worthwhile for her health to keep the dampness out of the house''; she agreed. He told her it would cost $185 and she said, ''Go ahead.'' He ''had $185 coming from Mrs. Quinn''; she gave him $50 on account when he asked her for money. He never received the balance of $135. In addition she owed him $50 for rerouting the water lines; such change was necessary in the building of the steps. She owed him for the plans and for the wall in addition to that item of $50. Since he had given $225 to Mr. Paonessa and since Mrs. Quinn owed him about $350, the amount ''she had left to get back'' was '' [a]bout $100 or $150, some small amount like that.''

When he spoke to the officer in April, he did not tell him that he had gone to Las Vegas and had had ''a disaster'' there, although he may have said ''something jokingly.'' At that time, he was still holding some of the money. He asked Mrs.

Quinn for his money for the retaining wall but she did not pay him. He told her he was going to take it out of the money he was holding. He felt that if he did not pay Mr. McKay, he (the appellant) "couldn't stay in business"; McKay asked him for the money every time he saw him. He finally paid him. He paid back $125 to Mrs. Quinn because he "wanted to give her the balance of the money she had given" him. She agreed with him that his figures were correct, but she wanted $100 more when he went to her place of business a week or 10 days before the trial. Until he was told that "the deal was off," he had the money available and could have presented it to Mr. Capponi "if he would complete the deal." Thereafter, he applied the money against what he felt was owed to him.

On cross-examination, the appellant said that in March and April 1959, he was a builder but not a licensed contractor. He was an employee of licensed contractors for whom he was doing the work on the property. He was building the wall for such contractors. Sometimes they told him to take the payment "if it would go faster that way." He had to account to them for payment and expenses.

On the plans prepared by Mr. McKay, the appellant's employers were stated to be the general contractors. They were asked for the money for the drawings and said that it should be obtained from the appellant. When he built the wall, he knew that Mrs. Quinn was paying $60 a month on a month-to-month tenancy. At the time the pipes had to be moved, Mr. Paonessa was unavailable and so the appellant asked Mrs. Quinn what to do about them; she told him to move them and so he felt that she was responsible for that work. The pipes related to a project which had been ordered by Mr. Paonessa.

When asked, "You had no feeling that the $525 belonged to Mr. Paonessa, did you?" the appellant answered, "It belonged to Mr. Paonessa? He hadn't made the deal yet." He further answered, ". . . I think that as long as that money was their money and they owed me money, I had the right to take some of that money and use it to pay bills that they rightfully owed." He further testified that if, on his direct examination, he said he thought that Mr. Paonessa was the owner of the property at the time he started building the steps, that was a mistake.[2]

---

[2]The cross-examination of the appellant as to a prior conviction of a felony is hereinafter set forth.

■ As stated in *People* v. *Newland,* 15 Cal.2d 678, at page 681 [104 P.2d 778], in reviewing the sufficiency of the evidence to sustain the conviction " 'We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.'

■ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.''

■ In the course of his argument that the evidence was insufficient to show that he was guilty of embezzlement, the appellant states: "The complaining witness has testified that the defendant represented himself to be the agent of the owners of the property and from this testimony it must be concluded that she did not consider him her agent. If he was not her agent, when he had possession of the money, he could only be the agent of CAPPONI [*sic*], and, in that event, the conviction must be reversed because the information does not charge the defendant with committing grand theft from CAPPONI [*sic*].'' Such reasoning does not stand on a sound basis. A similar contention was unsuccessfully made in *People* v. *Hedderly,* 43 Cal.2d 476, wherein the Supreme Court said, at pages 479-480 [274 P.2d 857] : "Hedderly's claim of a material variance stems from an asserted discrepancy between the allegation of the indictment that he unlawfully took money belonging to Pacific Mutual and the proof. He presents the record as clearly establishing that the money belonged to the trustees for whom he acted as agent. The only tenable theory for finding him guilty of theft, he argues, is that of embezzlement which requires a showing that he fraudulently appropriated property entrusted to him. (*Cf.* Pen. Code, § 503.) There is no evidentiary support, he asserts, for a finding either that the money belonged to Pacific Mutual or that it entrusted the money to him. . . . Finally, even if it were concluded that there was no defrauding of Pacific Mutual but only of the trustees, such a variance would be only in the designation of the person injured and could not be deemed material. (Pen. Code, § 956; *People* v. *Foster,* 198 Cal. 122-123 [243 P. 667].)''

■ This court stated in *People* v. *Reinschreiber,* 141 Cal. App.2d 688, at page 696 [297 P.2d 658] : "Theft, as defined in section 484 of the Penal Code, includes theft by trick and

device, theft by false pretenses, and embezzlement. (*People* v. *Jones,* 36 Cal.2d 373, 376-377 [244 P.2d 353]; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]; *People* v. *Bartges,* 126 Cal.App.2d 763, 769 [273 P.2d 49].)  'Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an ''unlawful taking'' has been proved.' (*People* v. *Ashley, supra,* p. 258.)  On appeal from a judgment of conviction of theft, where the only asserted basis of appeal is insufficiency of the evidence, the judgment must be affirmed if there is sufficient evidence to support the judgment on the theory of theft by trick and device, or by false pretenses, or by embezzlement.''

 In the present case the evidence warranted a conviction upon the theory of embezzlement. As stated in section 503 of the Penal Code: ''Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted.''  The gist of the offense is the appropriation to one's own use of property held by him for devotion to a specified purpose other than his own enjoyment of it. (*People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38].)  The money of which the appellant herein obtained possession was entrusted to him as the down payment in the purchase of the particular parcel of real property. When he diverted part thereof to his own purposes, his conduct constituted the crime of embezzlement. (See *People* v. *Otterman,* 154 Cal.App.2d 193, 206 [316 P.2d 85]; *People* v. *Cook,* 167 Cal.App.2d 247, 249-250 [334 P.2d 307].)

 To avoid the conclusion that he was guilty of embezzlement, the appellant asserts that the evidence established a good defense within the provisions of section 511 of the Penal Code. That section is: ''Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him.'' In the first place, the jury, in determining the credibility of the appellant as a witness, was free to disbelieve his testimony with respect to the matter. In *People* v. *Proctor,* 169 Cal.App.2d 269 [337 P.2d 93], a similar contention was made; the appellant claimed that she took a cashier's check because she was owed wages in excess of the amount of the check. The

trier of fact did not believe her version of the matter. In holding that the appellant's contention could not be sustained on appeal, Mr. Justice White said, at page 276: "Whether appellant took the check openly, in good faith and under claim of title, is a question of fact for determination by the duly constituted arbiter of the facts, and such a claim does not depend solely upon whether the claimant believes he was acting lawfully, but the surrounding circumstances must reasonably indicate good faith (*People* v. *Clemmons,* 136 Cal. App.2d 529, 535 [288 P.2d 1021]). It is fundamental that the credibility of witnesses is committed to the trial court, and in the instant case the trial judge was not required to believe appellant's version of the transaction." (See also *People* v. *Clemmons,* 136 Cal.App.2d 529, 535 [288 P.2d 1021].) Moreover, with respect to the proper construction of section 511 of the Penal Code, Mr. Justice White said, at page 277: "In the final analysis, at most, appellant claims the proceeds of the check here in question as an offset against a debt due her for overtime wages. This is not a defense contemplated by section 511 of the Penal Code, which does not excuse the unlawful retention of the property of another to offset or pay demands held against him (*People* v. *Morley,* 89 Cal.App. 451, 455 [265 P. 276]). As was said in *People* v. *Ranney,* 123 Cal. App. 403, 409 [11 P.2d 405] : '. . . The defendant had money in his possession which he claims belonged to the company, and which he sought to retain to pay a demand for commissions which he asserts were due to him from the company. He had no right to help himself to the funds of the company, even to pay an acknowledged debt. The latter portion of Section 511, *supra,* declares that the provision of that section, "does not excuse unlawful retention of the property of another to *offset or pay demands held against him.*" ' " Clearly, the jury was warranted in reaching the conclusion that there was no merit in the appellant's attempted defense but, rather, that he acted with the unlawful intent which is an element of the crime of embezzlement. (See *People* v. *Proctor, supra,* 169 Cal.App.2d 269, 277-278.)

In reliance on *People* v. *Ephraim,* 77 Cal.App. 29 [245 P. 769], the appellant asserts that the conviction cannot stand because the prosecution failed to establish the time "precisely when the embezzlement did take place." But that case is not in point under the facts herein involved. In the present case, there was no change in the nature of the relationship of the parties with respect to the money during the course of

their dealings; no mere debtor-creditor relationship ever arose herein. Consequently, there is no merit in the contention.

To properly evaluate the contention that there was prejudicial error in the course of the cross-examination of the appellant, it is necessary to set forth portions of the record verbatim. The following occurred: ''Q. Now, sir, relative to that, you have been convicted of a felony in the past, is that correct—that was grand larceny in New York in '29, and you served a term in prison therefor, in Sing Sing? A. I think that was 30 years ago. Q. All right, is that correct? A. Was it 30 years ago? Q. Is that correct? A. It is correct, but it wasn't grand larceny, it was hypothecation. Q. Well, hypothecation is another form of embezzlement, isn't it? A. No, it is supposedly a misdemeanor in this state. I called the City Attorney's office and that was their verdict. Q. It was a felony in New York, was it not, and you served time in Sing Sing? A. Yes. Q. Sing Sing is a state penal institution, isn't it? A. That's right. Q. The hypothecation, that was in Palm Springs, wasn't it? A. No, no. Mr. Lambros [counsel for the defendant]: Your Honor, I am going to object to that. . . . Then, your Honor, she is going to come in by the back door and ask, 'That was in Palm Springs, wasn't it?'—let her ask the question specifically, 'Were you?' and then let her prove it otherwise if he denies it. The Court: Well, he has admitted he was convicted of a felony. The witness: In New York. Mr. Lambros: But she is talking about Palm Springs now. The Court: Well, that is obviously because of the defendant's explanation or attempted explanation to say it was a misdemeanor or would have been a misdemeanor in California. The fact is, Mr. Miller, you were convicted in New York, is that correct? The witness: Yes. The Court: Of the crime of a felony, is that right? The witness: Yes. The Court: You may proceed. . . . Mrs. Linn [deputy district attorney], I think you should confine yourself to the question, whether or not he has been convicted of a felony and the nature of the felony. Mrs. Linn: I am satisfied with his explanation. I have nothing further.'' On redirect examination, the following transpired: ''Q. Mr. Miller, what was the nature of the conviction in New York? A. It was in the 1929 market crash—— . . . Mrs. Linn: I think it is immaterial. The question is whether or not he was convicted. . . . The Court: Yes, we are not going to go into the facts and circumstances of this man's conviction, as you well know . . . . the man was convicted of a

felony and that may be considered by the jury for one purpose and one purpose only, namely, . . . the question of credibility of that witness. We are not going to go into the details of any prior conviction and try the other case. . . . If he wants to tell us what the actual offense was, by name, he can do so. Q. By Mr. Lambros: What was the offense, Mr. Miller? A. The offense was called hypothecation. I even used to remember the number of it, in the New York law. . . . Q. By Mr. Lambros: It was hypothecation? A. It was hypothecation. Q. How much time did you spend? A. One year.''

As a means of impeachment, it is proper to ask a defendant testifying in his own behalf whether he has previously been convicted of a felony. (*People* v. *Cobb,* 45 Cal.2d 158, 162 [287 P.2d 752].) Such conviction may be shown although it occurred in another state (*People* v. *Reed,* 84 Cal.App. 685, 688 [258 P. 463]; *People* v. *King,* 77 Cal.App. 434, 437 [246 P. 822]), the test being whether the crime was a felony under the law of the jurisdiction where the offense was committed. (*People* v. *Theodore,* 121 Cal.App.2d 17, 29 [262 P.2d 630].) But a mere arrest or a conviction of a misdemeanor may not be shown for the purpose of the impeachment of a witness. (*People* v. *Chandler,* 152 Cal.App. 2d Supp. 916, 920 [313 P.2d 223].) The inquiry of the cross-examiner is limited to the fact of the conviction of a felony and the nature of the crime. (*People* v. *Braun,* 14 Cal.2d 1, 6 [92 P.2d 402]; *People* v. *Renteria,* 181 Cal.App.2d 214, 218 [5 Cal.Rptr. 119].) He may not go into details or circumstances surrounding the offense. (*People* v. *Braun, supra,* 14 Cal.2d 1, 6; *People* v. *Bigelow,* 104 Cal.App.2d 380, 387 [231 P.2d 881]; *People* v. *Wynn,* 44 Cal.App.2d 723, 732 [112 P.2d 979].) In the Wynn case, it was said that ''certainly the cross-examiner cannot delve into the question of the length of time served and conditions or circumstances surrounding the parole of a defendant.'' (See also *People* v. *Darcy,* 101 Cal.App.2d 665, 671 [226 P.2d 53]; *People* v. *Cobb, supra,* 45 Cal.2d 158, 162-163.) On the other hand, the defendant may not go into the matter of the merits of the charge of which he stands convicted. (*People* v. *Stirgios,* 23 Cal.App. 48, 49 [136 P. 957].) But while the cross-examination must at all times be conducted in good faith (*People* v. *Linyard,* 151 Cal.App.2d 50, 55 [311 P.2d 57]), the prosecutor may properly ask such questions as may be reasonably necessary to develop the fact of the conviction of a felony where the answers of the witness are evasive or equivocal. (*People*

v. *Howard*, 166 Cal.App.2d 638, 648 [334 P.2d 105] ; *People* v. *Tabb*, 137 Cal.App.2d 167, 171 [289 P.2d 858] ; *People* v. *Bauweraerts*, 164 Cal. 696, 704 [130 P. 717].)

▆▆▆▆ In the light of the applicable law, we turn to the facts in the present case. While it was not necessary for the cross-examiner to make reference to Sing Sing Penitentiary in the first question, no request was made to the court that the jury be admonished to disregard such reference. (*Cf.* *People* v. *Youders*, 96 Cal.App.2d 562, 567-568 [215 P.2d 743].) In any event, on redirect examination counsel for the defendant brought out that the defendant's confinement was for only one year. With respect to the reference by the prosecutor to some event in Palm Springs, as stated by the trial court such inquiry had its origin in the defendant's "explanation or attempted explanation to say it was a misdemeanor or would have been a misdemeanor in California." The present case is clearly distinguishable from the case upon which the appellant relies, *People* v. *Gomez*, 152 Cal.App.2d 139 [313 P.2d 58], because the appellant Miller had in fact been previously convicted of a felony. ▆▆▆▆ The test to be applied in determining the existence of prejudicial error has been stated by the Supreme Court as follows: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) ▆▆▆▆ Under such test, even if there was error, we find no cause for reversal of the judgment herein. (*Cf. People* v. *Wilkes*, 44 Cal.2d 679, 685 [284 P.2d 481] ; *People* v. *David*, 12 Cal.2d 639, 645 [86 P.2d 811] ; *People* v. *Green*, 15 Cal.App.2d 608, 610 [59 P.2d 824].)

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., concurred.

Vallée, J., concurred in the judgment.

Appellant's petition for a hearing by the Supreme Court was denied March 8, 1961.