THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* CRUZ RODRÍGUEZ MATOS and JOSÉ ANTONIO RIVERA TAÑÓN, Defendants and Appellants.

No. CR-68-209.          Decided December 23, 1969.

*Raúl Torres González* for appellant Cruz Rodríguez Matos. *Santos P. Amadeo* for José Antonio Rivera Tañón. *J. F. Rodríguez Rivera, Acting Solicitor General,* and *Lydia Nieves Franqui, Assistant Solicitor General,* for The People.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Appellants, Cruz Rodríguez Matos, known as Pin, and José Antonio Rivera Tañón, known as Piquete, were convicted of murder in the first degree for causing the death of the old man Luis Francisco Morales, while they perpetrated and carried out a burglary in the first degree. Rivera was unanimously convicted by the jury; Rodríguez waived his right to the jury during the course of the prosecution and the presiding judge found him guilty.

To request the reversal of the judgment Rodríguez Matos assigns the commission of three errors (i) that a testimony delivered by appellant without counsel during a critical stage of the arraignment was unduly admitted; (ii) that the court took into consideration an extrajudicial confession of codefendant Rivera Tañón upon deciding as to his guilt; (iii) that the evidence is insufficient to support the conviction.[1]

(i) The evidence for the prosecution tended to show that appellants went to the United States on or about August 25 to 26, 1962, after committing the offense charged against them. On March 7, 1963, after a process of extradition and after having been formally accused of Morales' death appellant Rodríguez, having been warned that he was charged with the murder, made a statement before the prosecuting

---

[1] Appellant Rivera Tañón filed his appeal on the brief presented by coappellant, because he understands that "it covers fully all the legal aspects which [Rivera Tañón] can raise in this case." Actually, the only assignment which can benefit Rivera is that concerning the sufficiency of the evidence, for the other two errors refer to Rodríguez Matos exclusively.

attorney Cabrera, in which he limited himself to state that he had left Puerto Rico since August 20, using an airplane ticket issued for another person.[2] It is argued that this statement is not admissible on the grounds that it was made while appellant was under police custody and without having been given the pertinent legal warnings, especially the one concerning assistance of counsel. Even when on its face it deals with exculpatory statements, *cf. People* v. *Couret Martínez,* 89 P.R.R. 56 (1963), (a) it appears that he was warned of his right not to testify and that, in case he did it, his statements could be used against him; and, (b) since the trial had been held in October 1963, according to our decision in *People* v. *Guadalupe Rosa,* 94 P.R.R. 180 (1967), the warnings required by *Rivera Escuté* v. *Delgado, Warden,* 92 P.R.R. 746 (1965) and *Escobedo* v. *Illinois,* 378 U.S. 478 (1964) were not necessary. See, *Johnson* v. *New Jersey,* 384 U.S. 719 (1966) and *Jenkins* v. *Delaware,* 395 U.S. 213 (1969), where it was held that the guarantees agreed upon in *Miranda* v. *Arizona,* 384 U.S. 436 (1966), did not apply to defendants whose retrial began after the opinion was delivered, on June 13, 1966, when the original process commenced prior to that date. If it were necessary, the voluntary character of the statement is not disputed either, and there is a total absence of intimations of physical or psychological coercion. And the mere fact, by itself, that he was under

---

[2] These facts revealing consciousness of guilt constitute admissible circumstantial evidence. 2 Underhill, Criminal Evidence, § 371 (5th ed. 1956), sets forth the rule as follows: "Evidence that the accused told falsehoods . . . about himself, his actions or his whereabouts at or about the time of the crime . . . is always relevant to show a consciousness of guilt. Such evidence would seem to have greater relevancy, cogency and force if the falsehoods were uttered after their author knew he was suspected or accused than before." And it adds: "It may be shown that when he was arrested the accused made false statements of his prior whereabouts to the officer who arrested him." See, II Wigmore, On Evidence, § 273 (3rd ed. 1940), *Rizzo* v. *United States,* 304 F.2d 810, 830 (8th Cir. 1962); *People* v. *Proctor,* 337 P.2d 93, 100 (Cal. 1959); *State* v. *Spica,* 389 S.W.2d 35, 53 (Mo. 1965); *State* v. *Aldrich,* 175 A.2d 803, 806 (Vt. 1961).

custody, did not render the statement inadmissible, *People* v. *Martínez*, 86 P.R.R. 390 (1962); *People* v. *Fournier*, 77 P.R.R. 208 (1964).

(ii) In the act of pronouncing judgment the trial judge stated:

"From this evidence the court infers, the court perceives defendant acting in a series of events at the time and right after the death of this person mentioned in the information, Morales. Together with these facts which show defendant's actions, which I will not comment on further because it is not necessary to pronounce judgment, the court has seen irrespectively, has also weighed evidence concerning his participation in the case of José Antonio Rivera Tañón.

"The court, in connection with defendant's action, right after, and at the time of these facts to which the information refers, in the company of a person, the court infers and concludes accordingly, not by the verdict of the jury, but by its own and particular initiative, guilty in the case. The court considers all of this as circumstantial evidence which leads it to the conclusion that defendant is guilty of the offense of murder in the first degree committed while perpetrating a burglary. I have not taken into consideration Rivera Tañón's confession. I only understand and consider it, as an attorney, I consider it applicable to the case of Rivera Tañón.

"*Rivera Tañón being guilty, the defendants' deeds, the acts carried out by defendant together with Rivera Tañón* lead the court to conclude in the sense stated that defendant is guilty of the offense of murder in the first degree." (Italics ours.)

■ According to our decision in *People* v. *Casanova*, 77 P.R.R. 690, 695–696 (1954), broadened in *People* v. *Barreto*, 87 P.R.R. 498 (1963), to cover a trial by the court, the extrajudicial testimony of a codefendant incriminating another is not legally competent or admissible evidence against the latter to determine his guilt.[3] This is the standard of legal evidence

---

[3] Despite the fact that the trial was held while the Rules of Criminal Procedure were in force and Rodríguez having knowledge of the testimony

which the judge had in mind upon making the above-copied statements.

The statements of the judge upon pronouncing judgment are confused and vague. On the one hand he categorically affirms that "I have not taken into consideration Rivera Tañón's confession;" and immediately following states that *"Rivera Tañón being guilty, the defendants'* deeds, the acts carried out by defendant *together with Rivera Tañón* lead the court to conclude in the sense stated that defendant is guilty of the offense of murder in the first degree." As it appears subsequently from the discussion of the error concerning the sufficiency of the evidence, the basic evidence, although not the only one, which links Rivera Tañón with the commission of the offense charged, is his statement given to the detectives in New York, where he charged Rodríguez with having directly caused the death of the victim.

■ Notwithstanding the statements of the judge,[4] we are not fully convinced that the trial judge made, upon pronouncing his judgment, an absolute abstraction of the so-called confession of codefendant Rivera Tañón and its content incriminating Rodríguez. Therefrom the references to "the

---

of Rivera Tañón, did not request, pursuant to Rule 91, a separate trial. See, *People* v. *Cruz,* 87 P.R.R. 124 (1963) and *People* v. *Flores Valentín,* 88 P.R.R. 895 (1963).

[4] In the original version of the transcript certified by the stenographer it had been included at the beginning of the last paragraph of the judge's statements copied in the text, the phrase "From the confession [it refers to codefendant Rivera Tañón's confession] I make a conclusion of his guilt at the same time," immediately before the statements "Rivera Tañón being guilty, the defendants' deeds, the acts carried out by defendant together with Rivera Tañón lead the court to conclude in the sense stated that defendant is guilty of the offense of murder in the first degree." By means of an order of August 22, 1968 the court ordered the elimination of the phrase above-copied.

Appellant Rodríguez requested the court to set aside this order on the ground that the judge had actually uttered such a phrase; but he did not appear at the hearing of the motion, where the judge limited himself to ordering that the original as well as the amended pages were to be sent up to this Court.

154

acts carried out by defendant together with Rivera Tañón," and "has also weighed evidence concerning his participation in the case of José Antonio Rivera Tañón." This being a case where the evidence is practically of a circumstantial and indirect nature, the assignment carries more weight. The reading as a whole of the statements of the judge leave us unsatisfied in the sense that the statements, highly harmful to Rodríguez, uttered by Rivera Tañón were not actually considered. It being thus, it is proper to set aside the judgment of conviction as to appellant Cruz Rodríguez Matos and to remand the case for a new trial.

(iii) For the consideration of the third error concerning the sufficiency of the evidence to support the conviction of Rivera Tañón it is necessary to summarize the evidence for the prosecution presented, the only evidence presented during the trial.

■ William Figueroa, testified: That on August 26, 1962, about midnight, while he was on the porch of his house, in the Ward Guadiana, of Naranjito, he saw defendants-appellants, whom he knew, descend, along a bridge which is behind his house, along a road leading to said ward, which leads to the house of the deceased, who lived at approximately 500 yards from his house. On the cross-examination he said that defendants did not carry anything in their hands and that they were the only persons he saw going along that road that night.

Juan Vidal Rodríguez, testified: That he lives in the Ward Achiote of Naranjito, where he is engaged in agriculture. On August 26, 1962 at about two or three in the morning, while coming back from the Ward Anones with his daughter and his wife, he saw defendants washing their hands at the riverbank near a bridge adjacent to his property and that is about one kilometer from the deceased's house; he stopped his vehicle farther on and from there he observed them until they finished washing their hands. Then he continued to his home.

Cruz Alicea testified: That she lives in a ward called Cerro Número Dos, at the outskirt of Naranjito. She knows Cruz Rodríguez since he was a child, and when he came back from the United States he stayed in the house of her father in Cerro Número Dos. On August 26, 1962 at about 6:00 a.m. upon opening the door of her house she saw Cruz Rodríguez Matos "slightly uncombed and dirty", with dirty shoes, on the porch of Belén Moure's house. When she asked him whether he had slept there, he answered that he had to carry a telegram to Ward Mavillas of Corozal and, "it is late." On cross-examination she said, that she did not see him in "an attitude or in any manner as the person who has committed something."

Basilisa Matos Rodríguez testified: That she was the aunt of defendant Cruz Rodríguez, known as "Pin". On August 26, 1962 at about 10:00 a.m., her nephew visited her in the company of another youth, whom she identified as codefendant Rivera Tañón. She offered them coffee, but they told her they were going to take a walk, they left, and did not return. She stated that she saw them in a normal attitude.

Juan Aníbal Reyes testified: That defendant Rivera Tañón, who was his wife's cousin, went to his home on August 26, 1962 at about 10:30 a.m., accompanied by codefendant, and told him that he had come to say good-bye because he was going to the United States to work. They had lunch there, and then took a rest till about 7:00 p.m. At that time he went out with them, his wife, and his little girl to the airport, at Rivera's request, to reserve the plane ticket. The latter had a pair of shoes in a paper bag; they did not carry suitcases or traveling bags. He left them at the airport taking steps for the reservations. They looked normal.

Pascual López Osorio said that he knew José Antonio Rivera Tañón as "Piquete" and he saw him the night of August 26, 1962 at the airport. Defendant told him he was

going to see his mother in New York, because he had received a telegram saying that she was seriously ill. . . .

Aurelio Archilla testified: That on August 26, 1962, at about 6:00 a.m., he found near his home, in Cerro Núm. Uno of Naranjito, a key ring with several keys and a razor, which he kept to locate the owner. He said he knew both defendants, who lived in Cerro Núm. Dos, that in order to go to Cerro Número Dos you had to go through Cerro Número Uno.

Police sergeant Luis A. Ramos, testified: That he knew both defendants, who lived in Cerro Núm. Dos of Naranjito. The shortest way between the deceased's house, in the Ward Guadiana and said place is Cerro Núm. Uno. He said he knew defendant Rivera Tañón's mother, who also lived in Cerro Núm. Dos. As a result of the official investigations he performed in connection with this case he obtained several objects at the deceased's residence, among others: a "cross-bar"; a loaded revolver; a blood-stained sheet, pillowcase, and shirt, and a mosquito net. The witness identified the objects as well as several photographs illustrating them. He said that when he saw the body laying on the bed, with the legs hanging, it was still alive. He noticed several blows in different parts of the body and that the pockets of the trousers were inside out. He knew that the man died at dawn the following day because he went to the wake. During cross-examination he said that he went to the scene of the crime at the request of doctor Raúl Barreras of the Municipal Hospital of Naranjito, who called him, after examining the victim at his home. Upon his arrival there, there were other relatives of the deceased, among others, his sons Ramiro and Luis and Dalila Padilla, his daughter-in-law. He stated that the victim's relatives told him that they had not moved any object. With their assistance, he undressed the wounded and dressed him with pajamas, before he was taken to the hospital in an ambulance sent by Dr. Barreras. He also said, that the deceased was crippled, he could hardly walk and he went only

to the first floor of the house with the assistance of his children.

Dalila Padilla Morales testified: That the deceased was her father-in-law. She lived nearby and almost every day she took his meals to him, though sometimes he went to her house. On Saturday, August 25, she took him his supper at about 5:00 p.m. and he handed her one dollar which he took out from a billfold which had "pretty much money," for her to buy him aromatic alcohol and aspirins. She said that her father-in-law's house had only one entrance door, which was closed with a bolt and a crossbar on the inside. On the following day after having received the money from her father-in-law she went over at about 10:00 a.m. to see why he had not gone to have breakfast. She called twice and he did not answer, for which reason she entered, since the door was ajar; that the bolt was forced; the entrance door had been forced. She saw her father-in-law on the bed, he was bleeding from his mouth, with a leg outside the mosquito net and with the right hand near the revolver. The crossbar of the door was by the side of the bed. She left immediately to look for her brother-in-law because her husband was at the church. The witness identified the objects which had been previously identified by Sergeant Ramos, specifically the keys, which she did not find that day "because I went to search in his pocket and they were inside out and did not have anything"; that in the kitchen there was a safe and it was not forced.

Ricardo Luis Morales, son of the deceased, testified that the latter kept money in a safe and he had money on him. After the events they counted the money of the safe in the presence of the prosecuting attorney and other policemen and it amounted to $1,170. The witness asserted that his father carried about $1,000 on him; he knew it because at about 10:00 a.m. he had changed a check for that amount, which he kept in his pocket.

Víctor Santos Ortega testified that he lived in Naranjito where he studied the seventh grade. On August 25, 1962 at about 9:00 p.m. he talked with defendants, whom he knows as "Pin" and "Piquete", in the bar of Juanito Colón, in front of the public square of Naranjito. Upon being questioned by the prosecuting attorney, "What did defendants tell you that night in regard to that man [the deceased]?" He answered, "They talked to me, but I do not remember."

Rafael Maldonado, police detective, testified, after a long discussion in the absence of the jury about the admissibility of his testimony, that during the month of March 1963 he took the steps to bring defendants from New York State by the process of extradition. Upon arriving at Puerto Rico, on March 7, 1963, he took defendants to the Office of Prosecuting Attorney, Ramón R. Cabrera, before whom defendant Cruz Rodríguez Matos, in his presence, delivered the testimony to which we referred upon discussing the former error.

María Mercedes Vélez, testified, in the absence of the jury, that she was first cousin of Rivera Tañón. On March 3, 1963, in the afternoon, her cousin called her so that she would go to look for him, and she took him to her house in New York where the detectives Arthur Williams and Arthur Douglas arrived. Defendant was nervous and for about fifteen minutes he answered detective Williams' questions. The latter made the questions in English and she translated them into Spanish, and when defendant answered in Spanish she translated into English. She said she studied in Puerto Rico up to the sixth grade and that she had been in New York for approximately ten years. She affirmed that several months later she signed a sworn statement before a notary about her conversation with her cousin and the detectives, at the latter's request, after reading said statement.

Upon delivering her testimony before the jury the witness reaffirmed her previous declaration. She also stated that after the aforesaid interview Rivera Tañón left her house with the

detectives; that Rivera Tañón, to questions made by the detectives, answered in Spanish that he had gone to the victim's house, and that Cruz Rodríguez had entered while he stayed outside and had given a blow to the deceased with a crossbar; that he entered when he heard a scream; that when they left they washed their hands in a nearby river; that previously he had been drinking in a bar in Naranjito; that his purpose in going to New York was to work to retain the services of an attorney "to get out of the problem he had." During the cross-examination she said that she did not believe she was qualified to serve as interpreter in the Spanish and English languages. She said that a day before the interview with Rivera Tañón there was a party in her house to which detectives Douglas and Williams went.

The chain of facts established by the evidence for the prosecution places Rivera Tañón at the scene of the crime and connects him with its commission. It constitutes sufficient circumstantial evidence to support his conviction. *People* v. *Bonilla*, 78 P.R.R. 144 (1955); *People* v. *Pérez Escobar*, 91 P.R.R. 9 (1964).

The judgment of conviction rendered in the case of José Antonio Rivera Tañón will be affirmed and it will be remanded for a new trial to be held for Cruz Rodríguez Matos.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate herein.